Exhibit C

1                UNITED STATES DISTRICT COURT

2                CENTRAL DISTRICT OF CALIFORNIA

3                          ---

4          HONORABLE S. JAMES OTERO, JUDGE PRESIDING

5                          ---

6

7

8    **UNITED STATES OF AMERICA,**        )
                                          )
9                                         )
                                          )
10              Plaintiff;                )
                                          )No. CR **18-121**SJO
11         VS                             )
                                          )
12   **CARLOS MIGUEL FERNANDEZ,**         **)**
     **EDWARD YASUSHIRO ARAO,**           )
13                                        )
                                          )
14              Defendants.               )
     _____     )

15

16

17            Reporter's Transcript of Proceedings
                    **JURY TRIAL - DAY FIVE**
                     Los Angeles, California
18              **TUESDAY, NOVEMBER 19, 2019**

19

20

21

22

23            Anne Kielwasser, CRR, RPR, CSR
              Federal Official Court Reporter
24            350 WEST 1ST Street, Room 4455
              Los Angeles, California 90012
25               Telephone: (213) 894-2969
                 anne.kielwasser@gmail.com

```
 1                      A P P E A R A N C E S

 2

 3      ON BEHALF OF THE PLAINTIFF:

 4      Katherine A Rykken
        Veronica Dragalin
 5      AUSA - Office of US Attorney
        General Crimes Section
 6      312 North Spring Street Suite 1200
        Los Angeles, CA 90012
 7      213-894-3659
        Fax: 213-894-0141
 8      Email: Katherine.rykken@usdoj.gov
        Email: Veronica.dragalin@usdoj.gov
 9

10      ON BEHALF OF THE DEFENDANT EDWARD Y. ARAO:

11

12      Edward M Robinson
        Rachel Robinson
13      Edward M. Robinson A Professional Law Corporation
        21515 Hawthorne Boulevard Suite 730
14      Torrance, CA 90503
        310-316-9333
15      Fax: 310-316-6442
        Email: Eroblaw@gmail.com
16
        Lisa Victoria Houle
17      Houle Law APC
        1230 Rosecrans, Suite 300
18      Manhattan Beach, CA 90266
        424-332-9079
19      Lisa@houle-law.com

20
        ON BEHALF OF THE DEFENDANT CARLOS M. FERNANDEZ:
21
        Ambrosio Eduardo Rodriguez
22      Michael J Hanagan
        The Rodriguez Law Group
23      626 Wilshire Boulevard Suite 460
        Los Angeles, CA 90017
24      213-995-6767
        Email: Aer@aerlawgroup.com

25
```

1

## INDEX

2   **WITNESS:**                                                    **PAGE:**

3
WITNESS, **TOLLIVER HART** SWORN                                     5
4   CROSS-EXAMINATION (RESUMED) BY MR. RODRIGUEZ:                    5
REDIRECT EXAMINATION BY MS. DRAGALIN                               23
5   RECROSS EXAMINATION BY MR. RODRIGUEZ                            30
REDIRECT EXAMINATION BY MS. DRAGALIN                               34
6   RECROSS-EXAMINATION BY MR. RODRIGUEZ                            35
**CLOSING ARGUMENTS BY THE GOVERNMENT**                            **117**
7   **CLOSING ARGUMENTS BY DEFENDANT ARAO**                         **152**
**CLOSING ARGUMENT BY MR. RODRIGUEZ**                              **171**
8   **REBUTTAL CLOSING BY GOVERNMENT**                              **186**

9                                  * * * * *

10                                 **EXHIBITS**

11   Exhibit No. 202 received in evidence              29

12   Exhibit No. 203 received into evidence            30

13                                 * * * * * *

14

15

16

17

18

19

20

21

22

23

24

25

| | | |
|---|---|---|
| 14:22:51 | 1 | been read.  Agreed? |
| 14:22:52 | 2 | **MR. ROBINSON:**  Yes, thank you, Your Honor. |
| 14:22:54 | 3 | **THE COURT:**  Okay. |
| 14:22:54 | 4 | **MS. RYKKEN:**  Yes. |
| 14:23:18 | 5 | **THE COURT:**  The government will have approximately |
| 14:23:20 | 6 | an hour to present opening and closing arguments.  The |
| 14:23:22 | 7 | government gets two opportunities to address you.  The |
| 14:23:27 | 8 | defendants have only one opportunity, because the government |
| 14:23:32 | 9 | has the burden of proof, and it's proof beyond a reasonable |
| 14:23:34 | 10 | doubt. |
| 14:23:34 | 11 | **MS. RYKKEN:**  Thank you, Your Honor.  May I |
| 14:23:40 | 12 | proceed? |
| 14:23:41 | 13 | **THE COURT:**  One second. |
| 14:23:43 | 14 | (Discussion off the record.) |
| 14:23:47 | 15 | **THE COURT:**  It may be that during the course of |
| 14:23:49 | 16 | the argument at some point in time, we may have to take a |
| 14:23:53 | 17 | short recess. |
| 14:23:55 | 18 | **MS. RYKKEN:**  Okay.  May I proceed, Your Honor? |
| 14:23:58 | 19 | **THE COURT:**  Yes, please. |
| 14:23:59 | 20 | **MS. RYKKEN:**  Thank you. |
| 14:24:03 | 21 | (CLOSING ARGUMENTS BY THE GOVERNMENT) |
| 14:24:06 | 22 | **MS. RYKKEN:**  Defendant Fernandez and defendant |
| 14:24:10 | 23 | Arao swore an oath to uphold the law.  Instead, they broke |
| 14:24:15 | 24 | the law. |
| 14:24:15 | 25 | This is not a simple case, but it is |

14:24:17  1  straightforward.  The defendants took advantage of the

14:24:22  2  privilege that it is to be a police officer.

14:24:25  3           Defendant Fernandez broke the law flagrantly,

14:24:29  4  daring to be caught.

14:24:32  5           Defendant Arao broke the law quietly but just

14:24:37  6  as brazenly.

14:24:40  7           For two years they bought and sold gun after

14:24:43  8  gun after gun.  Of course they knew it was illegal.  It is

14:24:49  9  their job to know the law.

14:24:53  10          And defendant Fernandez, he repeatedly helped

14:24:57  11  people to complete straw purchases of a gun.  He didn't care

14:25:02  12  who the gun went to, and in fact, he sold ten guns to a

14:25:07  13  felon.

14:25:07  14          Next, I'm going to walk you through the

14:25:09  15  charges, and then what lawyers call the elements of each

14:25:13  16  crime and how the evidence that we've shown you the last week

14:25:17  17  prove each element of each crime.

14:25:20  18          There are four crimes charged here in seven

14:25:23  19  counts.  There is Conspiracy charged in Counts One and Four;

14:25:28  20  Illegal Dealing, and that's Counts Two and Three; False

14:25:33  21  Statement, Selling a Gun to a Felon, and Conspiracy.

14:25:39  22          You have to decide each of these counts

14:25:41  23  separately and as to each defendant.

14:25:45  24          Defendants Arao and Fernandez are charged

14:25:47  25  together in Count One and separately in Count Two as to

14:25:50  1    defendant Fernandez, and Count Three as to defendant Arao.
14:25:55  2    They are charged with engaging in the illegal dealing of
14:25:58  3    firearms.
14:26:00  4            Defendant Fernandez is charged with four
14:26:06  5    additional counts, that was counts 4, 7, 10 and 11 with
14:26:12  6    disposing of a gun to a felon and false statement.  I'll
14:26:15  7    discuss those in more detail later.
14:26:17  8            Let's go through the element of illegal
14:26:19  9    dealing first, counts two and three.
14:26:26  10           First:  Neither defendant had a license to
14:26:28  11   sell guns.  And second, they're engaged in the business of
14:26:33  12   dealing guns.  And third, they acted willfully.
14:26:40  13           With respect to the first element, neither
14:26:44  14   defendant had a license to sell guns as an individual.  You
14:26:47  15   know that that's true because the ATF counts records of
14:26:51  16   everyone who has a license to deal.  That's what Special
14:26:55  17   Agent Hamilton told you on the stand the first day.
14:26:57  18           Here is the document showing that defendant
14:26:59  19   Fernandez did not have a license.  That's Exhibit 20.
14:27:06  20           You know that Arao didn't have a license.
14:27:09  21   Here is the document that shows you that he didn't have a
14:27:12  22   license.  That's that exhibit 21.  Neither defendant had a
14:27:18  23   license, and that's the first element.
14:27:24  24           All right, what does it mean *to be engaged in*
14:27:27  25   *the business*?  The Court instructed you earlier that the law

14:27:30  1    looked at several factors to determine whether the defendant
14:27:33  2    is engaged in the business of dealing firearms.  Not every
14:27:37  3    single one of these need be true, but these are the relevant
14:27:42  4    factors.
14:27:42  5                    First:  Time, attention and labor.
14:27:45  6                    Second:  In the regular course of business.
14:27:47  7                    Third:  The principal objective of livelihood
14:27:52  8    and profit.
14:27:53  9                    And fourth:  The repetitive purchase and
14:27:55  10   resale of gun.
14:27:57  11                    Let's turn to the first factor:  Time,
14:28:02  12   attention and labor.  For example, the defendants each
14:28:09  13   maintained Instagram accounts that were designed to advertise
14:28:13  14   and sell guns.  Here's the one from Ronin Tactical Group.
14:28:16  15   That's exhibit 42.  In the entry page here you can see nine
14:28:21  16   images, all of which show guns, it also has some advertising
14:28:25  17   and marketing materials.
14:28:25  18                    Sure, Ronin Tactical sells some guns as a
14:28:29  19   dealer, but the defendant Arao also used Ronin Tactical to
14:28:31  20   facilitate his side business of selling off-roster guns.
14:28:35  21                    Here is the38superman.  This is the first
14:28:39  22   post for his account from September of 2015.  You can see
14:28:45  23   what it says, the bottom line:  "That one was 7,000.  It's
14:28:50  24   not for sale, but I will soon have approximately 30, 38
14:28:55  25   Supers for sale at difference prices."

14:28:58   1          From the outset defendant Fernandez intended

14:29:00   2     to sell guns, off-roster guns.

14:29:03   3          Each defendant set time, as any regular

14:29:07   4     business would, they created Instagram accounts, they had

14:29:12   5     contents that they posted to Instagram, advertisements, they

14:29:14   6     went to gun shows.

14:29:16   7          You can see from the evidence that we've

14:29:18   8     shown you that defendant Fernandez was the sales guy.  His

14:29:22   9     Instagram account had thousands of followers.  He was making

14:29:26   10    calls and arranging deals.

14:29:27   11          The defendant Arao worked behind the scenes,

14:29:32   12    receiving off-roster guns from other sellers and taking care

14:29:35   13    of the paperwork.  They went to gun shows together.  Here are

14:29:38   14    just a few:  The Ontario Gun Show in May of 2016.  The post

14:29:38   15    says that he went with the38superman.

14:29:46   16          Another gun show from July of 2016.  You can

14:29:48   17    see from the image that the38superman or defendant Fernandez

14:29:52   18    went to the gun show with defendant Arao.

14:29:56   19          They also had marketing material.  For

14:30:00   20    example, hats.  You can see T-shirts there.  You heard the

14:30:06   21    witness Pelayo tell you that he received a T-shirt from the

14:30:10   22    defendant Fernandez.  All of these are hallmarks of

14:30:13   23    conducting a regular business.  That's the second factor.

14:30:17   24          Turning to the third.  Profit.  Before we

14:30:35   25    turn to profit, I have a handful of others to show you.  You

14:30:39  1   can see that they had a wide selection of the Colt .38

14:30:39  2   Supers, the off-roster guns.  This is a posting also from the

14:30:41  3   Ronin Tactical page.

14:30:46  4            Defendant Fernandez, he even had sales.  So,

14:30:50  5   he said this gun is originally going for 2300, but for the

14:30:54  6   weekend only dropping it down to 2K.

14:30:56  7            You can also see that the products were

14:31:00  8   moving quickly from this Instagram record.  He says:  "Sold

14:31:08  9   bro, last night."

14:31:08  10           Defendant Fernandez in his e-mail said:  I

14:31:11  11  have more than 10 new ones in the box.  They are black or

14:31:14  12  stainless steel.  They go for 2000 to 2300.

14:31:19  13           You can see that they sent text messages,

14:31:23  14  they made phone calls, they negotiated prices to buy guns,

14:31:26  15  and then they actually sold guns, which I will talk about

14:31:29  16  later.  Here again defendant Fernandez is saying:  *I have*

14:31:34  17  *several new in box.  California legal on a PPT sales, which*

14:31:39  18  *you now by now is a private party transfer.  It's not a gun*

14:31:44  19  *from a dealer.*

14:31:50  20           Another from the Instagram record.  Defendant

14:31:54  21  Fernandez says:  *Look at the Instagram page.  Send me the*

14:31:57  22  *pictures -- pics -- of the ones you like, and I can give you*

14:32:00  23  *prices.*

14:32:00  24           Another hallmark of operating a business.

14:32:03  25           He even said:  *What's your budget like?  I*

14:32:09  1    *have several.  Prices vary, 4500 to 9500.*

14:32:15  2              You can see that in Exhibit 45A.

14:32:18  3              He had a range of prices.  You can see that.

14:32:20  4    He's telling you what the different prices are:  4500, 6500,

14:32:26  5    6000, 4800, 13,500, and 5500.

14:32:37  6              Defendant Fernandez treated this like a

14:32:40  7    second job, he even called in sick at work.  You can see that

14:32:45  8    in this message.  He said:  *What time, old friend, so I can*

14:32:49  9    *get sick at work.*

14:32:52  10             Then moving on to the third factor, profit.

14:32:56  11             The defendant wanted to make money from

14:32:58  12   illegally selling guns.  And you know that they wanted to

14:33:01  13   make money because that's what they told you that they were

14:33:04  14   doing over and over again.  For example, they knew that they

14:33:08  15   could get off-roster pretty cheap.

14:33:10  16             Here is defendant Fernandez said:  Like I

14:33:13  17   said, I get those pretty cheap because I got exempt status in

14:33:18  18   Cali and can get off-roster guns.

14:33:21  19             Again, reading from the bottom up.  Someone

14:33:24  20   says I saw them on Gun Broker, but it was going to be a bitch

14:33:26  21   to bring into Cali.  And the defendant says:  Yep, they can't

14:33:30  22   come into the state.  They're off-roster guns.  So, the ones

14:33:35  23   that are already here get pricey.

14:33:37  24             And he knows exactly how much he can get from

14:33:40  25   bringing the gun into the state.  He says:  *Yeah, the price*

14:33:43  1    *are jacked once they entered this fucked up state.  In*

14:33:49  2    *general, look at any gun out of state and bump it up, about*

14:33:54  3    *2K if sold here.*

14:33:58  4              And defendant Arao, he admitted that he did

14:34:04  5    this to make a profit.  He said:  *You're making anywhere from*

14:34:08  6    *three to four to $500 depending on what it is.  So, it's not*

14:34:13  7    *like you're making $30 off a new gun, you're making more.*

14:34:17  8              That was the point of selling off-roster

14:34:21  9    guns.  They made more money.

14:34:23  10             He also said:  Well --

14:34:24  11             From the second sentence:  I know the ones I

14:34:27  12    paid for where I think I paid like almost 10,000 for.  And

14:34:33  13    then those sold for 12, I think.  And then he repeats that.

14:34:37  14    Then at the bottom:  *It's not a very good investment when*

14:34:39  15    *you're making -- you're putting in ten to make two, you know?*

14:34:43  16    *But $2000 on a $10,000 investment without doing any work,*

14:34:49  17    *that's a 20 percent return for free.  That is a great*

14:34:53  18    *investment.*

14:34:56  19             And the witness Cervantes, he was the first

14:34:59  20    witness in the case.  He came in and he told you he set up a

14:35:02  21    gun deal with defendant Fernandez.  He told you that he paid

14:35:06  22    $1600 for one gun on December 12 of 2016.  You know he bought

14:35:11  23    the gun.  Here is the Form 4473 for that gun.  That's at

14:35:16  24    Exhibit 114.

14:35:17  25             For that same gun, defendant Arao bought it

14:35:20  1   just a month prior for $789.99, and you can compare the two
14:35:29  2   serial numbers for yourself on the bottom of the page on the
14:35:31  3   left.  That's an $800 profit in a month, a 100 percent
14:35:37  4   markup, and that's just one gun.
14:35:38  5                   That markup is consistent with what you saw
14:35:43  6   in the Instagram advertisement.  That's in Exhibit 74.
14:35:47  7                   You heard testimony from Agent Hart who put
14:35:50  8   this chart together.  He looked at invoices from gun dealers
14:35:54  9   to confirm the sale price, and you can check those underlying
14:35:57  10  records.  That's at exhibits 35 through 39.  He then compared
14:36:03  11  them to advertised prices on Instagram.  You can check the
14:36:07  12  underlying ads yourself.  That's Exhibit 53 through 59.  And
14:36:12  13  there is the markup.
14:36:16  14                   Let's turn to the last factor:  The
14:36:18  15  repetitive purchase and sale of guns.  You know that
14:36:23  16  defendant Arao repeatedly bought and sold guns.  He did so 41
14:36:28  17  times in two years.
14:36:30  18                   You can see that summarized for you in
14:36:32  19  Exhibit 11, and the underlying records for these are there
14:36:35  20  for the evidence and you as well -- for you as well.
14:36:38  21                   Similarly, you know that defendant Fernandez
14:36:40  22  bought and sold guns repeatedly, 45 of them in two years.
14:36:45  23  The summary chart is at Exhibit 10.
14:36:48  24                   So, I submit to you that defendant Fernandez
14:36:52  25  and defendant Arao were each engaged in the business of

14:36:55  1   dealing.  The government is not required to prove each of

14:36:59  2   these factors existed.  They're only a factor you may

14:37:02  3   consider.  But, in fact, each of these factors is present

14:37:06  4   here against both of the defendants.

14:37:12  5              So, the legal definition of engaging in the

14:37:14  6   business.  It tells you what is and is not dealing.  It has

14:37:19  7   on the spectrum, on the right side of something that is

14:37:22  8   dealing.  Time, attention, labor, the regular course of

14:37:25  9   business, profit, and repetitive.  Those are the four things

14:37:28  10  we went through.  It's not dealing on the other hand if it's

14:37:31  11  an occasional sale or part of a personal collection or a

14:37:35  12  hobby.

14:37:36  13             This was not an occasionally sale.  They were

14:37:39  14  not collectors.  If they were, what would you expect to see?

14:37:45  15  Well, you would not expect a collector to hold on to a gun

14:37:50  16  for four days in between picking it up and selling it again,

14:37:54  17  four days, 13 days, 14 days.  You can see all of these dates

14:38:00  18  in Exhibit 12.

14:38:01  19             And defendant Arao, he did the same thing.

14:38:03  20  He held on to a gun for:  Zero days, zero days, one day, and

14:38:08  21  one day.  And you can see the rest of these in Exhibit 16.

14:38:12  22             Moreover, a collector wouldn't buy the same

14:38:18  23  model again and again and again and again and again.  You can

14:38:21  24  see that defendant Fernandez repeatedly bought Colt.38

14:38:26  25  Supers.  He also bought Colt .45.

14:38:31   1              Defendant Arao, he did the same thing.  You

14:38:34   2    can see he also bought exclusively Colt .38 Supers, and he

14:38:38   3    bought multiple of the same model on the same day.  For

14:38:41   4    example, in October 22nd, 2015, he bought five them on the

14:38:49   5    same day.  I submit to you that defendant Fernandez and

14:38:51   6    defendant Arao's conduct crossed the line into dealing.

14:38:56   7              The final element of this offense is whether

14:38:59   8    or not each of defendant acted willfully.  And that's an

14:39:03   9    important element.  So, here on the screen is the legal

14:39:07  10    definition of "willfully."  Says:  "Willfully" requires proof

14:39:10  11    that the defendant knew that his conduct was unlawful but

14:39:14  12    does not require proof that the defendant knew of the federal

14:39:17  13    licensing requirement.  So, two things:  Knew conduct was

14:39:24  14    unlawful, but need not know the licensing requirement.

14:39:30  15              So, let's talk about the ways that the

14:39:32  16    defendants knew that their conduct was unlawful, that it was

14:39:36  17    willful.  Bottom line, no one in California can engage in the

14:39:41  18    business of dealing off-roster firearms to the public.  No

14:39:45  19    one.  Whether you have a license or not.  That's what this is

14:39:50  20    meant to show you.

14:39:54  21              An individual without a license to deal of

14:39:58  22    course cannot engage in the business of dealing with any guns

14:40:01  23    whether those are off-roster guns or not.

14:40:04  24              Even more, an FFL that has a license, like

14:40:09  25    Ronin Tactical, cannot engage in dealing with off-roster

14:40:13  1    firearms to the public.  Ronin Tactical couldn't do it, and

14:40:16  2    so defendant Arao and defendant Fernandez decided to do it on

14:40:20  3    their own.

14:40:21  4                Defendants knew it was illegal.  They were

14:40:25  5    police officers who swore an oath to uphold the law.

14:40:30  6                So, let's talk about each of them separately.

14:40:34  7    Let's go to defendant Arao first.

14:40:36  8                Defendant Arao, he applied for a license to

14:40:38  9    be a dealer.  He operated Ronin Tactical, a federally

14:40:44  10   licensed dealership.  Of course he knew that he needed a

14:40:48  11   license to sell guns, any gun.  He knew what it meant to sell

14:40:52  12   a gun through a dealer.  He understood the requirements.

14:40:56  13               These are what he certified, that he

14:40:58  14   understood when he opened Ronin Tactical.  That is his

14:41:02  15   signature in 2013, well before any of his off-roster sales in

14:41:07  16   this case.  And yet, defendant Arao engaged in a side

14:41:11  17   business on his own as an individual, separate and apart from

14:41:16  18   Ronin Tactical.

14:41:16  19               There is also this Form 4473 which I know you

14:41:21  20   have seen at length.  He certified every time he signed this,

14:41:25  21   41 times, that he understood, here it is, that:  *The*

14:41:29  22   *repetitive purchase of firearms for the purpose of resale for*

14:41:34  23   *livelihood or profit without a federal firearms license is a*

14:41:40  24   *violation of law.*

14:41:41  25               He was warned.  He knew exactly what

14:41:44  1    "engaging in the business" is.  He was warned 41 times.

14:41:47  2                    I submit to you that the defendant Arao knew

14:41:50  3    he was breaking the law when he sold 41 guns without a

14:41:54  4    license.

14:41:58  5                    Moving to defendant Fernandez.  This is how

14:42:02  6    you know that he understood that his conduct was unlawful.

14:42:05  7    He signed the same form 45 times.  This is Exhibit 27 if you

14:42:10  8    want to take a look.  Same certification:  I *further*

14:42:13  9    *understand that the repetitive purchase of firearms for the*

14:42:15  10   *purpose of resale for livelihood and profit without a license*

14:42:19  11   *is a violation of law.*

14:42:22  12                    And you know that he knew about this because

14:42:28  13   he said so in his e-mail.  Federal firearms licensee is

14:42:32  14   referred to as an FFL.  You've heard that repeatedly in this

14:42:34  15   case.  And he says:  Below is my FFL holder's info for the

14:42:38  16   completion of the transfer.

14:42:39  17                    And this is just one example of an e-mail.

14:42:41  18                    And from a different e-mail he says:  *I want*

14:42:45  19   *to buy this gun, but I'm in Cali; however, I'm a full-time*

14:42:49  20   *police officer with exempt status and have an FFL ready to*

14:42:52  21   *receive it for me.*

14:42:53  22                    Of course defendant Fernandez understood what

14:42:56  23   an FFL was, that you had to have a license to sell guns.  He

14:43:01  24   even says -- and I'm reading the highlighted part:  *I'm aware*

14:43:04  25   *of the restrictions, and I hate them too; however, I'm a*

14:43:08  1   *full-time police officer in the State of California with*

14:43:11  2   *exempt status.  I also have an FFL holder that is willing to*

14:43:15  3   *receive the handgun from me.*

14:43:19  4              Defendant Fernandez knew he was breaking the

14:43:21  5   law when he sold 45 guns without a license.  He even told you

14:43:25  6   that he was aware of this.  This is the ATF advisory saying:

14:43:31  7   A law enforcement official who regularly acquires off-roster

14:43:35  8   firearms and sells or disposes of them for a profit is

14:43:40  9   engaging in the business of the dealer of firearm and must be

14:43:44  10  licensed.  And further, you are not an actual

14:43:48  11  transferee/buyer of a firearm if you're acquiring the firearm

14:43:52  12  for or on behalf of any other person.

14:43:54  13             This is from March of 2017.

14:43:56  14             Defendant Fernandez continued to sell guns

14:43:59  15  after this date, and he continued to engage in straw

14:44:02  16  purchases after this date.  Of course he knew that what he

14:44:05  17  was doing was illegal.

14:44:08  18             So, for "willfully," both defendants knew

14:44:11  19  their conduct was unlawful, and even though the law does not

14:44:14  20  require that they know the licensing requirement, they both

14:44:17  21  did.

14:44:21  22             And so I submit to you that defendants

14:44:24  23  Fernandez and Arao, each wilfully engaged in the business of

14:44:27  24  dealing in firearms without a license.  The government asks

14:44:31  25  you to find them guilty.  Defendant Fernandez on Count Two,

14:44:34  1    and defendant Arao on Count Three.

14:44:38  2                    So, let's go through Count One.  This is the

14:44:42  3    conspiracy.  This is the conspiracy to engage in the business

14:44:46  4    of dealing without a license.  You have to decide this count

14:44:50  5    as to each defendant as well.

14:44:52  6                    And in order for the conduct we've just

14:44:55  7    described also to be a conspiracy, you have to find three

14:44:58  8    things are true:  First, an agreement existed between two

14:45:01  9    people; here, it will be defendant Fernandez, defendant Arao.

14:45:07  10   That each defendant joined in the conspiracy, knowing of at

14:45:11  11   least one of its objects and intending to help it along,

14:45:15  12   i.e., that each of these defendants knew that the goal was to

14:45:17  13   deal firearms and that they intended to help deal guns.

14:45:22  14                   And the third:  That one person in the

14:45:24  15   conspiracy, either one of them, committed one overt acts to

14:45:31  16   further the conspiracy.

14:45:32  17                   An overt act occurs simply when someone does

14:45:35  18   something.  So, as you'll see when you get the indictment in

14:45:37  19   the jury room, it alleges a 101 overt acts against defendants

14:45:41  20   Arao and Fernandez.  For example, sending an e-mail, filling

14:45:45  21   out paperwork, advertising, selling a gun, receiving money.

14:45:50  22   You need only decide that one of those overt acts occurred in

14:45:54  23   order to find conspiracy.

14:45:56  24                   So, how do you know that they had an

14:45:59  25   agreement?  Well, I mean they told you that they had an

14:46:01  1    agreement.  Here they are at a gun show, they're advertising

14:46:05  2    together as the38superman and Ronin Tactical.  The bottom

14:46:10  3    left it says:  Follow us on Instagram.  It says:  *We're at*

14:46:13  4    *the Sacramento Cal Expo show.*

14:46:16  5              And the next one, you can see on the comment

14:46:18  6    on the right.  It says:  *Ontario Gun Show with the38superman.*

14:46:23  7              They were acting together.

14:46:25  8              And again, on this post, for Ronin Tactical,

14:46:29  9    he has an advertisement for an off-roster gun, and the

14:46:34  10   defendant Fernandez responds and says:  *This pistol is*

14:46:36  11   *available here in California, DM if interested.*

14:46:40  12             They were going back and forth together

14:46:42  13   selling off-roster guns.

14:46:45  14             And this was from defendant Fernandez's

14:46:48  15   Instagram account.  He says:  *We work out of Gardena,*

14:46:53  16   *California from a friends's auto shop.*

14:46:55  17             And you know from the evidence that you heard

14:46:57  18   that Ronin Tactical is located in Gardena, and it was located

14:47:00  19   inside an auto shop.

14:47:03  20             So, you know each defendant joined the

14:47:15  21   conspiracy.  This is Element Two.  This here is just one of

14:47:16  22   the forms 4473.  You can see at the top the defendant

14:47:20  23   Fernandez is that transferee, and then on the right, you can

14:47:24  24   see it was done at Ronin Tactical Group and signed by Edward

14:47:28  25   Arao.  This is one of many forms 4473 that we have in this

14:47:31   1    case where they were working together.

14:47:33   2                    And you can see from this pie chart that you

14:47:37   3    saw earlier, that for Fernandez, of the 45 guns that he sold,

14:47:44   4    58 percent of them, in some fashion or another, whether by

14:47:47   5    purchase or sale, was transacted through Ronin Tactical.

14:47:50   6                    So, that's the agreement.  And you know that

14:47:55   7    each defendant joined a conspiracy based on the same

14:47:58   8    evidence, and the conspiracy was only the two of them.  They

14:48:02   9    weren't other people.

14:48:06   10   And then you also each find that one overt

14:48:10   11   act occurred.  That's simply that one of the defendant

14:48:13   12   actually did something to further the conspiracy.  That could

14:48:16   13   be any one of the guns sold.  You've already seen that

14:48:17   14   evidence, and you have the records for all of the guns sold,

14:48:19   15   at exhibits 10, 11, 27, 29, 30 and 31.  That's the summary

14:48:27   16   chart for all the sales, that's the underlying records for

14:48:30   17   all the sales.  Any one of the Instagram posts addressed

14:48:34   18   messages that are alleged as an overt act.  That's another

14:48:35   19   one.  You can find that that constitutes an overt act.  You

14:48:39   20   can find those at exhibits 45 through 52.

14:48:43   21                    So, I submit to you that the evidence shows

14:48:46   22   that defendant Arao and defendant Fernandez conspired

14:48:49   23   together to illegally deal firearms.

14:48:55   24                    So, let's turn to the second phase of the

14:48:57   25   evidence that you saw.  This is the portion of the case that

| | |
|---|---|
| 14:49:00 | 1 |
| 14:49:05 | 2 |
| 14:49:08 | 3 |
| 14:49:11 | 4 |
| 14:49:16 | 5 |
| 14:49:21 | 6 |
| 14:49:23 | 7 |
| 14:49:25 | 8 |
| 14:49:29 | 9 |
| 14:49:35 | 10 |
| 14:49:35 | 11 |
| 14:49:39 | 12 |
| 14:49:39 | 13 |
| 14:49:44 | 14 |
| 14:49:49 | 15 |
| 14:49:51 | 16 |
| 14:49:54 | 17 |
| 14:49:57 | 18 |
| 14:50:00 | 19 |
| 14:50:04 | 20 |
| 14:50:07 | 21 |
| 14:50:07 | 22 |
| 14:50:11 | 23 |
| 14:50:12 | 24 |
| 14:50:16 | 25 |

relates only to defendant Fernandez and not to defend Arao.

So as you know by now, defendant Fernandez is separately charged with three additional crimes:  False statements, in counts 10 and 11; disposing of a gun to a felon, in Count Seven; and conspiracy to commit both those two crimes, in Count Four.

So, defendant Fernandez is charged with aiding and abetting a straw purchase; meaning, he wasn't the one who actually signed the Form 4473, but he did help someone to commit that false statement.

So, this is charged in two counts, count 10, is for his sale to Pelayo, the witness that you heard from, and then one count is for his sale to Camacho, Jr. who was a felon.  And that's Count 10 and Pelayo is Count 11.

So there are going to be four elements for aiding and abetting.  First, someone else committed the crime of making a false statement during a purchase of a firearm.

Second, defendant Fernandez aided, counselled, commanded induced or procured that person with respect to at least one element of the crime, i.e., the defendant helped.

Third, the defendant acted with intent to facilitate the crime.

And fourth, defendant Fernandez acted before the crime was completed.

14:50:17  1         So, let's move on to the first part, that
14:50:21  2  someone committed a crime.  And here, someone committing a
14:50:24  3  crime is the straw purchase, the false statement in a
14:50:27  4  firearms record.
14:50:28  5         That particular offense has these four
14:50:30  6  elements, a false statement; second, a statement was made in
14:50:35  7  a record that a licensed firearm dealer was required to
14:50:38  8  maintain; and third, the dealer was a federally licensed
14:50:42  9  firearms dealer at the time the statement was made; and
14:50:45 10  fourth, the person making the statement knew it was false.
14:50:48 11         All right, so, that's a mouthful.  So, let's
14:50:51 12  go through it.  All right, so, you know that the Form 4473 is
14:50:56 13  a required record, that an FFl is required to keep because
14:51:00 14  that's what Special Agent Hamilton told you on the stand.
14:51:03 15  He's an expert in this.  Everyone is required to keep it.
14:51:04 16  That is an FFL.  You can see that at Exhibit 105.
14:51:07 17         You also know that with respect to Count 11,
14:51:11 18  which is the count for defendant, related to witness Pelayo,
14:51:16 19  that Turner's Outdoorsman, where the straw purchase took
14:51:20 20  place was an FFL.  And here is the document that shows you
14:51:22 21  that, at Exhibit 24.  So that's the first two, elements two
14:51:27 22  and three, required record, and the dealer was federally
14:51:30 23  licensed.
14:51:31 24         So, let's move to false statement.  The false
14:51:34 25  statement here is actually the statement of Bianca Ibaria,

14:51:39   1   Pelayo's girlfriend.  The false statement was certifying that
14:51:43   2   she was the one purchasing the gun but she was not the actual
14:51:46   3   purchaser.  It was for her boyfriend, Pelayo.  And this is
14:51:55   4   what we call throughout the -- throughout the case is what
14:51:58   5   we've called a straw purchase.
14:51:59   6              So, you can see here at Exhibit 105 the false
14:52:02   7   statement in Question 11A.  Ms. Ibaria certified that the
14:52:08   8   Colt .45 is for her, and it was not.  The witness Pelayo, he
14:52:11   9   told you that wasn't true.  He told you that the Colt .45 was
14:52:14   10  for him.  And the Colt .45 is the second gun on this list.
14:52:23   11             So, that's the first part, the false
14:52:25   12  statement.
14:52:25   13             And fourth, that Mr. Ibaria knew the
14:52:31   14  statement was false when she made it.  Well, you know that
14:52:34   15  she knew it was false because Pelayo is the person who set up
14:52:39   16  the deal from start to finish.  He told you that the Colt .45
14:52:42   17  semiautomatic was for him.  He said that he asked his
14:52:47   18  girlfriend to buy it.  He told you that defendant Fernandez
14:52:50   19  suggested that his girlfriend do the paperwork, and you know
14:52:53   20  that Pelayo's own testimony is corroborated.  We showed you
14:52:57   21  banking record, that's at Exhibit 94, and Instagram records
14:53:00   22  from the time.
14:53:01   23             This is from the day or the day after Pelayo
14:53:05   24  picked up the gun.  This is from his Instagram account.
14:53:08   25  Exhibit 108A, showing the gun that he just picked up.

14:53:12   1        And so you know that a straw purchase

14:53:15   2    occurred.  There is a false statement, and the required

14:53:18   3    record, the Form 4473, Turner's Outdoorsman with an FFL, and

14:53:25   4    the statement was false when Bianca Ibaria made, and she knew

14:53:29   5    it.

14:53:30   6        So, all of that goes to show that the first

14:53:33   7    element of aiding and abetting the straw purchase occurred.

14:53:35   8        The second element, the defendant Fernandez

14:53:37   9    aided, counselled, commanded, induced or procured that

14:53:41  10    person.  That is, the defendant helped the person commit the

14:53:44  11    crime.

14:53:47  12        All right, so you know the defendant

14:53:49  13    Fernandez helped to commit the crime of committing a false

14:53:53  14    statement because he recommended it.  He set up the deal with

14:53:57  15    Pelayo.  It was Bianca Ibaria who bought the gun.  You can

14:53:58  16    see that in Exhibit 29.

14:54:01  17        You also know that he received money from

14:54:04  18    Pelayo.  Before the transaction happened, defendant Fernandez

14:54:08  19    brought the guns to Turner's Outdoorsman on the day of the

14:54:13  20    transaction, and he actually transferred the gun to Bianca

14:54:18  21    Ibaria.

14:54:19  22        The third element is the defendant intended

14:54:21  23    to facilitate the crime.  Did he know that it was a straw

14:54:25  24    purchase?  Yes.  Did he intend to help Ibaria and Pelayo with

14:54:32  25    the straw purchase?  He did.

14:54:33  1      Let's look through some of these records.

14:54:36  2      Before the transaction, Fernandez received

14:54:40  3  $1,000 from Adalberto Pelayo.  These are the bank records

14:54:44  4  from his Chase Bank account.  Okay, on the day of the

14:54:48  5  transaction, July 24, Pelayo told you that he paid Fernandez

14:54:52  6  in cash in the parking lot before the transaction.

14:54:54  7      The transaction occurred.  Then on August

14:54:58  8  3rd, Ms. Ibaria picked up the gun.  That same day -- here is

14:55:03  9  the Instagram post from Pelayo, and he said:  Big thanks to

14:55:07 10  my compa, the38Superman, for always looking out for me.  Got

14:55:11 11  to hit the range this weekend for sure.

14:55:14 12      Agent Hart told you that when it looks like

14:55:16 13  that, @the38superman, that means that he got a notification

14:55:20 14  of this post.  Defendant Fernandez got a notification that it

14:55:25 15  was in fact Pelayo that had the gun.

14:55:28 16      So, did defendant Fernandez help them with

14:55:32 17  the crime?  Did he intend to do that?  Yes.  Pelayo told you

14:55:35 18  Fernandez knew that Pelayo was prohibited from buying a gun

14:55:40 19  because he told him; and in fact, it was defendant Fernandez

14:55:44 20  that suggested that Pelayo have Ibaria do the paperwork.  He

14:55:50 21  obviously understood that he was intending in helping a straw

14:55:52 22  purchase.

14:55:56 23      And, in fact, defendant Fernandez had no

14:55:59 24  problem telling people how to commit this crime.

14:56:02 25      This is from his Instagram account.  Someone

14:56:05  1    asked:  H*ow do crooks do it?*  He says:  *A parent, old lady,*

14:56:11  2    *wife, girlfriend, LOL, or anyone else.*  I.e., if you want a

14:56:16  3    gun, this is how you do a straw purchase.

14:56:20  4          And another one, someone says:  *I will need*

14:56:23  5    *to pay my ticket.  It would be a DMV reject to buy the gun.*

14:56:30  6    He says:  *Oh, okay.*  And then the person said:  *Yeah, I can't*

14:56:32  7    *do the transfer because I owe ticks.  My wife turns 21 in two*

14:56:37  8    *months, and I can tell her to buy it.*

14:56:38  9          Instead of saying, no, no, that's a straw

14:56:41  10   purchase, defendant Fernandez said:  *Yes, man, let's see what*

14:56:45  11   *I will have then.*

14:56:45  12          Defendant Fernandez understood a straw

14:56:58  13   purchase.  He didn't care who the guns went to.  You can see

14:57:01  14   it here on the last line:  *You would need to buy it here*

14:57:04  15   *rather than Mexico.  What you do with it, I can't control*

14:57:07  16   *that.  LOL.*

14:57:08  17          So, that's the first three elements of aiding

14:57:14  18   and abetting a straw purchase.

14:57:17  19          You also know that he acted before the crime

14:57:21  20   was completed, and we talked about all of these different

14:57:23  21   factors.  Before the deal he set it up with Pelayo, he knew

14:57:28  22   Pelayo couldn't buy a gun, recommended Pelayo to do the

14:57:29  23   paperwork, received money from Pelayo, brought the gun to

14:57:33  24   Turner's, and then went ahead and did the paperwork with

14:57:34  25   Ibaria.  All of those occurred before the crime was

14:57:36   1    committed.

14:57:37   2                    And now Count 10.  Sorry, Count 11.  So,

14:57:45   3    count --

14:57:47   4                    This should be Count 10, but Count 10 is the

14:57:51   5    count for the second straw purchase to Camacho, Jr.  This is

14:57:55   6    similar in the element, except that the gun went to Camacho,

14:57:59   7    Jr. instead.  So, I'm not going to repeat all of this for

14:58:01   8    you.  But for this county it doesn't matter if Fernandez knew

14:58:05   9    that Camacho, Jr. was a felon.  That's for a later count.  He

14:58:08   10   simply had to know that this gun was for Camacho, Jr. and not

14:58:12   11   for his father, Camacho, Sr.  That's it.  Right?

14:58:16   12                    So, how do you know that defendant Fernandez

14:58:18   13   was aware, that this gun -- this is the gold plated gun that

14:58:21   14   we saw a lot of yesterday -- was for Camacho, Jr. and that

14:58:25   15   the Form 4473 was false.

14:58:27   16                    All right, so let's look at the evidence

14:58:30   17   here.  So here is the gun.  This is the gun we're talking

14:58:33   18   about for count ten, it's a gold plated pistol, Serial No.

14:58:40   19   27057LW, and this is the Form 4473 for that transaction.

14:58:45   20                    And you can see Camacho, Sr. bought the gun

14:58:49   21   on July 29 of 2017, and then the serial number over there,

14:58:56   22   27057 Colt Commander, a .38 pistol.  That's the gun that

14:59:00   23   we're talking about.

14:59:01   24                    So, we'll put together a little timeline.

14:59:03   25   You know that the defendant Fernandez set this deal up by the

14:59:06  1   messages and Instagram, and so let's go through those.

14:59:10  2   First, on June 23rd, 2017, you have an Instagram message

14:59:14  3   between Camacho, Jr. and defendant Fernandez.  This is that

14:59:18  4   record.

14:59:19  5            Calichi Livin, who Agent Hart told you is

14:59:24  6   Camacho, Jr. says:  *I think I'm going to jump on it.  I just*

14:59:27  7   *have to wait for my dad to get back.  So we can do that in*

14:59:31  8   *about a week.*

14:59:31  9            Defendant Fernandez comes back and says:  *You*

14:59:35  10  *want the premier, or you want me to hang on to them or you*

14:59:39  11  *want to get the gold one?*  Calichi Livin Camacho, Jr. says:

14:59:44  12  *I want them all.*

14:59:46  13           About a week later on June 30th of 2017, have

14:59:49  14  an additional conversation.  Defendant Fernandez:  *Old*

14:59:53  15  *friend, my friend, says that you're interested in the gold*

14:59:58  16  *one.*  Camacho, Jr.:  *I'm on that Commander, right?*

15:00:01  17           And Commander is the model of this gun which

15:00:03  18  you saw in Form 4473, and then defendant sent a picture of

15:00:07  19  the gun, the same gold gun.  And Camacho, Jr. says:  *I think*

15:00:10  20  *I'm going to have to jump on it.*

15:00:12  21           Of course defendant Fernandez knew that this

15:00:15  22  gun was for Camacho, Jr.  There is no reference in any of

15:00:18  23  these text messages that this gun is for Camacho, Sr., only

15:00:22  24  that Camacho, Sr. would have to do the paperwork.

15:00:27  25           And this is a blow-up of the picture we just

| | |
|---|---|
| 15:00:30 | 1 |
| 15:00:35 | 2 |
| 15:00:38 | 3 |
| 15:00:41 | 4 |
| 15:00:45 | 5 |
| 15:00:48 | 6 |
| 15:00:51 | 7 |
| 15:00:53 | 8 |
| 15:00:56 | 9 |
| 15:00:59 | 10 |
| 15:01:03 | 11 |
| 15:01:03 | 12 |
| 15:01:06 | 13 |
| 15:01:11 | 14 |
| 15:01:16 | 15 |
| 15:01:18 | 16 |
| 15:01:21 | 17 |
| 15:01:24 | 18 |
| 15:01:28 | 19 |
| 15:01:30 | 20 |
| 15:01:34 | 21 |
| 15:01:39 | 22 |
| 15:01:42 | 23 |
| 15:01:44 | 24 |
| 15:01:48 | 25 |

saw.  You can actually see the serial number and the image that defendant Fernandez sent, 27057LW.

Okay, July 7th, they have another conversation in WhatsApp.  And Camacho, Jr. says:  I'm going to pick -- or:  I'm picking up my pops at the airport.  We're going to try next week.  I'll let you know like Monday or Tuesday, see when my dad has a chance.

And then Fernandez responds:  *Okay, let me know.  So far which ones are you going to do, which ones have convinced you?*  And Camacho, Jr. says:  *I want all three of them.*

And at the bottom he tells Fernandez:  *No, no, no, you said they were for me.*

And July 10th again, another WhatsApp message.  Defendant Fernandez says:  *You can purchase these online.*  He says:  *If you fire the gun, LOL.  They are just for show.*  And Camacho, Jr. says:  *So we'd have to be changing then.*  I.e., this is the grips they're talking about on the gun.  *When I fire it.*

And then the -- and then on July 28, the day before the transaction, defendant Fernandez says:  So are we still on for tomorrow?  Indicating that, yes, in fact he is going to sell the gun to Camacho, Jr. the next day.

And then on the day of, July 29th, we have additional text -- WhatsApp messages between them.  Defendant

15:01:54  1   Fernandez is telling him where to go at the Ammo Brothers in

15:01:58  2   Ceritos.  And he also says:  *That's ten minutes away from*

15:02:03  3   *where we meet all the time.*

15:02:04  4              And then right before the transaction,

15:02:06  5   defendant Fernandez says:  *Okay, I'm here.  I'll be in the*

15:02:08  6   *parking lot.*

15:02:09  7              Now, this is a blow up, is from the Form 4473

15:02:12  8   for that gun.  You can see it happened at Ammo Brothers in

15:02:16  9   Ceritos, exactly as Fernandez planned.

15:02:19  10             Once the purchase took place, they had some

15:02:24  11  additional conversation afterward.  August 13 of 2017.  This

15:02:28  12  is from defendant Fernandez.  He says:  *Yes, it's still here.*

15:02:33  13  *My buddy @calichiliving, i.e, Camacho, Jr., is going to pick*

15:02:37  14  *them up soon.  He just bought the fully gold plated one.*

15:02:42  15             That's the gun that we've seen again and

15:02:44  16  again and again.

15:02:45  17             And this, the date of pickup, is August 16 of

15:02:49  18  17, three days after defendant Fernandez sends this message.

15:02:53  19             And then, finally, this is from August 22nd,

15:03:03  20  about a week, approximately, after Camacho, Jr. has received

15:03:07  21  the gun.

15:03:09  22             Okay, this is an Instagram post from Calichi

15:03:13  23  Livin, Camacho, Jr., and he says:  *A golden horse for the*

15:03:16  24  *collection.*

15:03:16  25             And you can see that that's the exact same

| | |
|---|---|
| 15:03:18 | 1 |

gun.

*Thanks to my friend @the38superman.*

And then you can see an initial to the left,
says the38Superman, defendant Fernandez, likes the image,
indicating that he understood that this was Camacho, Jr.'s
gun.

Okay.  So, the elements of aiding and
abetting, here they are.  The evidence shows that defendant
Fernandez aided and abetted a false statement a second time,
in selling a gun to Camacho, Jr.

You saw the Form 4473 that Camacho, Sr.
signed, that was false.  The gun was for Camacho, Jr.

The text messages between defendant Fernandez
and Camacho, Jr., they made clear that the gun was for
Camacho, Jr.

Second, you know that defendant Fernandez
helped Camacho, Sr. to commit the crime of making a false
statement, i.e., he actively arranged the deal with Camacho,
Jr. for weeks ahead of time.

He confirmed after the fact the gun was
bought by Camacho, Jr., and Camacho, Jr. confirmed that the
gun was for him.  He in fact alerted defendant Fernandez of
that in his post.

And finally, defendant Fernandez intended to
facilitate the crime.  You saw that in the messages, and he

15:04:33  1   understood that Camacho, Sr. would be the person filling out

15:04:36  2   the paperwork.  The repeated references to "pops" were not a

15:04:43  3   mistake.

15:04:43  4           Finally, defendant acted before the crime was

15:04:46  5   complete.  You can see that from the timeline we put

15:04:50  6   together.  Towards the right is the date of the transaction,

15:04:53  7   July 29, and there are repeated messages back and forth for

15:04:58  8   the month beforehand.  And so, I submit to you that the

15:05:02  9   evidence shows that defendant Fernandez is guilty of count

15:05:07  10  11.

15:05:12  11          We're nearing the end.

15:05:14  12          Turning to Count 7, which is Disposing of a

15:05:18  13  Firearm to a Felon.  There are two elements to this offense:

15:05:23  14  Knowingly disposing of a gun to a felon; and second, that the

15:05:27  15  defendant, that is Fernandez, knew or had reasonable cause to

15:05:30  16  believe that that person was a felon.

15:05:32  17          So, this is what "dispose of" means:  To

15:05:35  18  transfer the gun so that the felon has possession.

15:05:38  19          It's this gun that we're talking about again.

15:05:41  20          The Court instructed you that a person

15:05:44  21  possesses a firearm if the person knows of its presence, who

15:05:47  22  has physical control of it, or knows of its presence and has

15:05:50  23  power and intention to control it, and also that more than

15:05:53  24  one person can be in possession of a firearm .

15:05:56  25          You know that Camacho, Jr. has possession of

15:06:01  1    this gun.  This is from a video on his own phone, on July 29

15:06:05  2    of 2017, the date of the transaction.

15:06:11  3              You know from their text messages that he had

15:06:13  4    an intention to possess and control:  I think I'm going to

15:06:17  5    jump on it.  I just have to wait for my dad to get back.  I

15:06:22  6    want them all.  I think I am going to have to jump on it.  I

15:06:26  7    want all three of them.

15:06:27  8              He also says:  *No, they're for me.*

15:06:30  9              Defendant Fernandez understood that this was

15:06:33  10   for Camacho, Jr., because he just bought the gold plated one.

15:06:38  11             And then later defendant Fernandez says:

15:06:41  12   *It's the plain one, like the one you bought.  Like the one*

15:06:45  13   *you bought.*

15:06:46  14             He is talking to Camacho, Jr.

15:06:50  15             He also understood that Camacho, Jr. was

15:06:52  16   going to be firing the gun.  *Has to be changing them, the*

15:06:56  17   *grips, when I fire it.*

15:07:00  18             So I'll tell you now that defendant Fernandez

15:07:02  19   knew that this gun was going to Camacho, Jr.

15:07:11  20             All right, so, you also know from Camacho,

15:07:14  21   Jr. was a felon.  You saw the conviction records for that.

15:07:17  22   That's not contested here.

15:07:22  23             So, the second element is that defendant

15:07:24  24   Fernandez knew or had reasonable cause to believe that he was

15:07:28  25   a felon.

| | | |
|---|---|---|
| 15:07:30 | 1 | All right.  So, defendant Fernandez is a |
| 15:07:32 | 2 | police officer.  He knows the law.  He knows that felons |
| 15:07:36 | 3 | cannot buy guns.  He told you:  *This is how crooks do it.* |
| 15:07:42 | 4 | See that?  He says:  *A parent can do it.* |
| 15:07:44 | 5 | Like Camacho, Sr. |
| 15:07:46 | 6 | This is how you do a straw purchase.  This is |
| 15:07:48 | 7 | how you do it if you're a crook.  And then that's exactly |
| 15:07:52 | 8 | what he and Camacho, Jr. did.  And you can see that in |
| 15:07:58 | 9 | Exhibit 46. |
| 15:07:59 | 10 | A reasonable person in defendant Fernandez's |
| 15:08:03 | 11 | position would have seen all of the red flags.  This was the |
| 15:08:07 | 12 | 10th gun that Fernandez sold to Camacho, Jr. but did the |
| 15:08:12 | 13 | paperwork through his brother or his father.  You saw all of |
| 15:08:17 | 14 | that evidence starting at the June 2nd transaction. |
| 15:08:22 | 15 | In every instance defendant Fernandez talked |
| 15:08:26 | 16 | to Camacho, Jr. on the phone in text messages, on Instagram. |
| 15:08:30 | 17 | These deals were not arranged between defendant Fernandez and |
| 15:08:34 | 18 | either of the two people that signed the papers. |
| 15:08:38 | 19 | In every instance defendant Fernandez knew |
| 15:08:41 | 20 | that Camacho, Jr. could not complete the paperwork himself. |
| 15:08:45 | 21 | He had to bring his dad or his brother.  And defendant |
| 15:08:49 | 22 | Fernandez knew it.  And yet, the evidence shows Camacho was |
| 15:08:55 | 23 | there with his dad and his brother when they bought the guns. |
| 15:09:02 | 24 | He needed a family member every single time. |
| 15:09:06 | 25 | By the 10th gun defendant Fernandez had |

15:09:09  1    reason to believe that Camacho, Jr. was a felon.  There is

15:09:14  2    only one explanation for defendant's behavior.  Camacho, Jr.

15:09:17  3    was a felon, and he knew it, but he didn't care because he

15:09:21  4    was making money.

15:09:22  5              Let's look at Exhibit 182A.  Defendant

15:09:25  6    Fernandez says:  *You can bring pop to do the paperwork, and I*

15:09:30  7    *can take the paper he signs, and then you can go and have a*

15:09:34  8    *great time.*

15:09:36  9              There is no legitimate reason why Camacho,

15:09:39  10   Jr.'s father would have had to do the paperwork.  There is no

15:09:43  11   legitimate reason for Fernandez to suggest that Camacho,

15:09:46  12   Jr.'s father should do the paperwork.  The only explanation

15:09:51  13   is that Fernandez knew that Camacho, Jr. was a felon, and he

15:09:55  14   couldn't do it himself.

15:09:59  15             So I submit to you that the evidence shows

15:10:01  16   that defendant Fernandez knew that Camacho, Jr. was a felon

15:10:04  17   when he sold him the 10th gun.

15:10:07  18             And, finally, the last conspiracy count,

15:10:11  19   Count Four.  This charges defendant Fernandez along with the

15:10:14  20   felon Camacho, Jr., Camacho, Sr., and Camacho Maravilla, with

15:10:18  21   conspiracy to dispose of a firearm to a felon and making a

15:10:22  22   false statement.

15:10:23  23             The crime charged in Count Four is the

15:10:25  24   agreement between defendant Fernandez and the Camachos to

15:10:30  25   provide guns to Camacho, Jr. and also to make false

15:10:35  1    statement.

15:10:35  2              You need not find both of those things were

15:10:38  3    true, that they both agreed to the straw purchase and agreed

15:10:42  4    to dispose of the guns to a felon, only that they agreed to

15:10:47  5    do one of those things.  So, it's the same element as before,

15:10:51  6    same element as before.

15:10:53  7              First, there was an agreement between two or

15:10:56  8    more people to commit a crime; second, the defendant became a

15:10:59  9    member of the conspiracy knowing of its object and intending

15:11:03  10   to help accomplish it; and, finally, one of the members of

15:11:06  11   the conspiracy committed one overt act in furtherance of the

15:11:10  12   conspiracy.

15:11:10  13             So for all the reasons we just discussed,

15:11:13  14   there was clearly an agreement between Camacho, Jr. and

15:11:17  15   defendant Fernandez.  So all of the text messages, you saw

15:11:20  16   all the Instagram posts, and you saw that there were phone

15:11:24  17   calls between them.

15:11:24  18             So the evidence of this count is the ten guns

15:11:28  19   that Fernandez sold to Camacho, Jr.  You saw evidence

15:11:32  20   throughout the trial, and you know that those guns were for

15:11:34  21   Camacho, Jr. and not for any of the people that are listed as

15:11:37  22   purchasing it on the Form 4473.

15:11:39  23             This is Exhibit 118.  You can see for

15:11:42  24   yourself the defendant Fernandez sold or coordinated the sale

15:11:46  25   of each of these ten guns.  You saw that yesterday and then

| | | |
|---|---|---|
| 15:11:50 | 1 | Thursday in the trial.  You saw it yesterday and Monday. |
| 15:11:54 | 2 | Yesterday was Monday.  So, yesterday.  Okay. |
| 15:11:57 | 3 | There were text messages, photographs and the |
| 15:12:01 | 4 | videos of each of these guns on Camacho, Jr.'s phone.  Each |
| 15:12:05 | 5 | of those text messages was in furtherance of the conspiracy |
| 15:12:07 | 6 | and is in itself an overt act. |
| 15:12:10 | 7 | You know that nine of the guns were recovered |
| 15:12:13 | 8 | from Camacho, Jr.'s house in the search.  And the sale of any |
| 15:12:18 | 9 | one of those ten guns is also itself an overt act. |
| 15:12:23 | 10 | So, there is a broader conspiracy here not |
| 15:12:25 | 11 | just to get that final 10th gun to Camacho, Jr., a convicted |
| 15:12:30 | 12 | felon, but it was to get all of those ten guns to him. |
| 15:12:37 | 13 | I submit to you that the evidence shows that |
| 15:12:40 | 14 | the defendant Fernandez conspired with the Camachos to |
| 15:12:43 | 15 | dispose of guns to a felon, that is Camacho, Jr., and to make |
| 15:12:47 | 16 | false statement, that is the straw purchases. |
| 15:12:54 | 17 | As I said before, this is not a simple case. |
| 15:12:57 | 18 | There's a lot of law thrown at you, but it is |
| 15:13:00 | 19 | straightforward.  Both of these defendants abused their |
| 15:13:03 | 20 | positions as officers of the law.  They swore an oath to |
| 15:13:08 | 21 | uphold the law, and they broke it for money.  They knew that |
| 15:13:12 | 22 | it was illegal when they did it. |
| 15:13:15 | 23 | Defendant Fernandez knew what a straw |
| 15:13:17 | 24 | purchase was.  He told people how to do a straw purchase, and |
| 15:13:21 | 25 | then he went ahead and did it again and again and again and |

15:13:25  1   again to a convicted felon.

15:13:29  2          The United States asks you to hold them

15:13:31  3   responsible for their action and find them guilty on all

15:13:34  4   counts.

15:13:36  5          THE COURT:  Thank you, Ms. Rykken.

15:13:38  6          We're going to take a short recess.  Please

15:13:40  7   return back to the courtroom, about ten minutes recess.  So,

15:13:45  8   25 after the hour, please.

15:13:48  9          COURT CLERK:  All rise, please.

15:13:50  10         (Following proceedings held outside the presence

15:14:24  11  of the jury.)

15:14:25  12         THE COURT:  I think you have about ten minutes

15:14:27  13  left.  So, you have another ten minutes, 20 minutes for

15:14:31  14  closing.

15:14:31  15         MS. RYKKEN:  I'm sorry, another 20?

15:14:34  16         THE COURT:  Another 10, so a total of 20.

15:14:35  17         MS. RYKKEN:  Thank you, Your Honor.

15:14:39  18         (Recess taken.)

15:28:58  19         THE COURT:  I think we're ready for our jury.

15:29:09  20         MR. RODRIGUEZ:  Is the Court's intention to have

15:29:13  21  me argue today as well?

15:29:15  22         THE COURT:  Yes.

15:30:59  23         (Following proceedings were held in the presence

15:31:24  24  of the jury.)

15:31:24  25         THE COURT:  Okay, we have the jury reassembled,

15:31:27  1   with the alternates, counsel are present with the defendants,

15:31:28  2   and we'll continue with the argument.

15:31:29  3            They are -- just to bring to the Court -- to

15:31:32  4   the jury's attention, there was a person in the courtroom who

15:31:36  5   was asked to leave during the proceedings.  He's not

15:31:38  6   associated with either of the parties here or any of the

15:31:40  7   parties here.  So he was just a person that was noticed by

15:31:46  8   security.  So, that being said, let's continue.

15:31:49  9            **MR. ROBINSON:**  Thank you, Your Honor.

15:31:53  10           (CLOSING ARGUMENTS BY DEFENDANT ARAO)

15:31:56  11           **MR. ROBINSON:**  Ladies and gentlemen, good

15:31:57  12  afternoon.  On behalf of me, Lisa Houle and Rachel Robinson,

15:32:04  13  it's been an honor, and it is an honor to represent Officer

15:32:08  14  Edward Arao.

15:32:09  15           Now, before I begin my closing statement, I

15:32:11  16  want you to remember three things from the government's

15:32:14  17  opening statement.  The first thing I'd like you to remember

15:32:18  18  is that they said that Officer Arao committed the one crime

15:32:23  19  that he's charged with because the conspiracy charge and the

15:32:27  20  substantive charge are the same thing, that he quietly

15:32:35  21  committed the crime, that he acted willfully because it's his

15:32:39  22  job to know the law, and that the bottom line is, that you

15:32:47  23  cannot sell off-roster handguns in California without a

15:32:52  24  license.  Keep those three things in mind.

15:32:57  25           Now, I've been doing this for a long time,

15:33:02   1   and I do this in my closing statements, but I feel

15:33:05   2   particularly compelled to do it today.  Being a juror in a

15:33:09   3   criminal case involves constitutional principles.

15:33:13   4               When we're raised by our parents, by our

15:33:18   5   teachers, by our priests, whoever it may be, we are told that

15:33:24   6   in order to be fair, you have to hear both sides.  And none

15:33:27   7   of us want to be unfair.

15:33:30   8               If we were dealing in a civil case where

15:33:34   9   we're talking about very important things like housing to

15:33:39   10  shelter or families, clothing and food to sustain us, those

15:33:44   11  are very important things.  And in a civil case, you get to

15:33:48   12  hear both sides, and the burden of proof requires the

15:33:52   13  prevailing side, or the plaintiff, to prove to a

15:33:55   14  preponderance of the evidence that they have made their case.

15:34:01   15              Being a criminal juror is a privilege, and

15:34:04   16  it's a unique experience, because a criminal juror, unlike in

15:34:09   17  a civil case, you're dealing with the most precious interest

15:34:14   18  that we have.

15:34:17   19              And our ^ Founding Fathers said that for the

15:34:21   20  government to convict someone of a criminal charge, every

15:34:27   21  element of the charge has to be proven beyond a reasonable

15:34:33   22  doubt.  The government has the burden of proving their case,

15:34:38   23  and a defendant has no obligation -- and you cannot hold it

15:34:43   24  against a defendant who chooses not to testify.  And that's

15:34:49   25  because all of us are presumed to be innocent.  So, the

15:34:56  1    presumption of innocence, in my humble opinion, should be a

15:34:59  2    presumption of "not guilty."  Because it sounds like we have

15:35:04  3    to show some form of innocence, and that's just not the case.

15:35:09  4    Please do not be confused.

15:35:12  5              You may have some suspicions, and I suggest

15:35:15  6    in this case there aren't any, but as a criminal juror, you

15:35:19  7    may have some beliefs that the government has proven their

15:35:21  8    case to some degree, but even if you have those suspicions,

15:35:28  9    if you are not firmly convinced, meaning that you can leave

15:35:31  10   this courtroom and five years, ten years later say: *Yes, I*

15:35:36  11   *was convinced beyond a reasonable doubt*, then you have to

15:35:39  12   find in this case Officer Arao not guilty.

15:35:45  13             There is another very important part of this

15:35:47  14   case.  And you've heard this instruction from Judge Otero

15:35:53  15   over and over again:  You cannot consider the evidence

15:35:57  16   against the codefendant for the crimes that he's charged with

15:36:02  17   against Officer Arao.

15:36:06  18             And what's the only issue in this case

15:36:09  19   against Officer Arao, the only issue?  The only issue is

15:36:13  20   whether or not the government has proven to you beyond a

15:36:19  21   reasonable doubt that when Officer Arao was selling these

15:36:22  22   off-roster handguns, the 41, he knew that he was violating

15:36:26  23   the law.

15:36:28  24             Generally, like in a murder case, ignorance

15:36:31  25   of the law is not a defense.  You do the act, you intended to

15:36:38  1    do the act, and you're guilty.  It doesn't matter if you

15:36:41  2    don't understand it's against the law to murder someone.  But

15:36:47  3    we live in a highly regulated society.  You heard Officer --

15:36:51  4    Agent Hamilton talk about the differences that we have here

15:36:54  5    with state and federal and local laws.  I believe Judge Otero

15:37:00  6    mentioned that as well in his opening statements to you

15:37:04  7    during jury instructions.

15:37:05  8                And because we live in such a heavily

15:37:08  9    regulated society, like with our guns, both state and

15:37:14  10   federal, innocent activity where the person does not know and

15:37:19  11   the government cannot prove that they know what they're

15:37:25  12   doing, that they're breaking the law, is not a criminal, is

15:37:28  13   not guilty.  And that's why with respect to this specific

15:37:32  14   charge that Officer Arao is facing, the government needs to

15:37:37  15   prove beyond a reasonable doubt that he knew that his conduct

15:37:41  16   was unlawful.

15:37:45  17               They don't have to prove that he knew the law

15:37:47  18   as read to you on the federal firearm dealing law, but they

15:37:51  19   have to prove to you beyond a reasonable doubt that when

15:37:57  20   Officer Arao was doing what he was doing, that he knew he was

15:38:02  21   violating the law.

15:38:07  22               Now, you can always tell the strength of the

15:38:10  23   government's case by the way they try to prove their case,

15:38:13  24   and I'll suggest to you very strongly here that because the

15:38:17  25   government has the burden of proof in this case, there has

15:38:20  1   been some design to maybe misdirect you, maybe even to

15:38:27  2   mislead you.

15:38:28  3           For instance, we know that Officer Arao was

15:38:30  4   interviewed for 58 minutes, but you only heard one minute,

15:38:36  5   and the only one minute excerpt that you heard was where

15:38:41  6   Officer Arao said:  *Yes, I was selling those off-roster*

15:38:46  7   *handguns for a profit*.  And we're not contesting that, and we

15:38:51  8   never have.

15:38:53  9           The prosecution talks about cash sales.  They

15:38:57  10  talk about gun sales, but in some of these instances where

15:39:03  11  Officer Arao is a responsible party for Ronin Tactical who

15:39:07  12  holds the corporate FFL, he was doing what he was supposed to

15:39:12  13  do under California and federal law to transfer the handgun,

15:39:19  14  whether or not it was from Ronin Tactical to himself or from

15:39:22  15  himself to a private party, he was DROSing the gun, to use

15:39:29  16  the vernacular, he was following 4473, that ^ NICKS -- you

15:39:38  17  saw that this morning -- and Officer Arao was making sure

15:39:42  18  that every single transaction complied with the law so that

15:39:46  19  that gun did not end up in the hands of a prohibited person,

15:39:53  20  somebody who is a drug addict, somebody who has been deemed

15:39:57  21  to be mentally incompetent under the state laws.

15:40:02  22          He was making sure that the law was being

15:40:05  23  followed.  And that is strong, strong evidence of his good

15:40:10  24  faith, and you cannot act in good faith, you just can't, and

15:40:18  25  knowingly act wilfully, violating the law.

UNITED STATES DISTRICT COURT

15:40:21  1          And so consider this as well.  The ATF based
15:40:27  2   upon an audits and some other information, decided to do an
15:40:33  3   attempted purchase of a handgun from Officer Arao at Ronin
15:40:38  4   Tactical.  Now, the audit was one that caused Agent Hart, and
15:40:47  5   this information was conveyed to him, to have two concerns.
15:40:48  6   The concerns were:  Some of the buyers who had purchased guns
15:40:53  7   through Ronin Tactical, and also the fact of the
15:40:58  8   codefendants's involvement.  That's it.
15:41:00  9          The government has the burden of proof.  If
15:41:04  10  there had been something in that audit that established that
15:41:12  11  Officer Arao knew he was violating the law, you can rest
15:41:16  12  assured that that auditor would have been up there on the
15:41:19  13  witness stand, and you can rest assured that that audit
15:41:22  14  report would be in your hands as a government exhibit.
15:41:25  15          The fact that it's not there tells you that
15:41:27  16  the government knows, that Agent Hart was telling the truth,
15:41:32  17  that there was nothing about the audit that concerned the
15:41:40  18  government about Officer Arao.
15:41:43  19          And so we have this undercover purchase, and
15:41:46  20  the undercover purchase is a legitimate law enforcement
15:41:51  21  tactic, but it was designed to get Officer Arao to violate
15:41:54  22  the law.  It was designed to get from Officer Arao some
15:41:58  23  indication, some knowledge, that he was acting willfully when
15:42:02  24  he was transferring these guns, because they know they have
15:42:09  25  to prove it.

15:42:10   1          You didn't, understandably, see that

15:42:12   2    undercover videotape.  You saw some photographs of Officer

15:42:16   3    Arao, you saw the gun.  But the reason you didn't see that

15:42:20   4    undercover videotape, is because there was nothing in that

15:42:24   5    undercover videotape to show that Officer Arao in any way, in

15:42:32   6    any way acted willfully.

15:42:34   7          In fact, when the agent was cross-examined

15:42:36   8    about that attempted purchase, it was clear that Officer Arao

15:42:43   9    did not conclude that purchase because he was acting in good

15:42:52  10    faith, and he was following the law.

15:42:55  11          Now, if Officer Arao were inclined to violate

15:42:59  12    the law and act willfully, maybe he would have said:  Look,

15:43:05  13    I'll give you the gun, and you call in your residency.  Or:

15:43:10  14    Look I can give you the gun, but I've got a buddy up at

15:43:15  15    Turner's who will backdate your firearm safety card, and

15:43:19  16    we're all good because I'm getting cash.

15:43:21  17          Now, if that were the case, you would have

15:43:24  18    seen that.  But the fact of the matter is, Officer Arao at

15:43:33  19    Ronin Tactical, which had been blessed by the ATF during the

15:43:38  20    application process, in his police uniform, in the front of

15:43:43  21    the office, with his police cruiser parked outside, making

15:43:49  22    absolutely no effort whatsoever to hide what he was doing, he

15:43:56  23    sold that gun, and he complied with the law.

15:44:02  24          Now, you did not hear that in the

15:44:05  25    government's direct examination.  You just didn't.  The

15:44:17  1    evidence about the field sobriety -- this is not field
15:44:20  2    sobriety -- the firearm safety card, the identification, the
15:44:25  3    residency, that had to come out on cross-examination, and
15:44:32  4    with the ATF expert, it had to come out on cross-examination
15:44:36  5    that the California DROS form and the Federal 4473 Form are
15:44:44  6    the same thing.
15:44:46  7                Remember, every single one of these
15:44:50  8    transactions that the government says support the fact that
15:44:55  9    agent -- excuse me, Officer Arao acted willfully, proving
15:45:01  10   beyond a reasonable doubt, was recorded with the California
15:45:06  11   Department of Justice, and it was reflected in the NCIS
15:45:15  12   database.
15:45:18  13               And none of these guns went into the hands of
15:45:20  14   somebody they shouldn't have, because Officer Arao did what
15:45:26  15   was required of him as a responsible party for Ronin Tactical
15:45:31  16   to comply with the law.  And he made no effort whatsoever to
15:45:36  17   hide what he was doing.
15:45:40  18               So, the only thing we're left with is
15:45:44  19   willfulness.  Has the government proven beyond a reasonable
15:45:46  20   doubt that Officer Arao knew that his conduct in these
15:45:54  21   private party transfers of these off-roster guns was
15:46:00  22   unlawful.
15:46:03  23               The government showed you the 4473 Forms, and
15:46:07  24   they did it through Agent Hart, and the 4473 Form has a
15:46:14  25   Question 16.  I'm just going to put my finger on it.  For

15:46:18  1    instance, it's in Exhibit 27.  It's in every single 4473

15:46:22  2    Form.  And it sets forth the definition of what is being --

15:46:26  3    was engaged in the business of dealing, and the government

15:46:32  4    had the agent read it to you, and the government is going to

15:46:34  5    stand up here and tell you that that's evidence of

15:46:37  6    wilfulness.  And the government is going to say:  Look,

15:46:41  7    because he's a police officer, he should have known.  But,

15:46:45  8    remember, on cross-examination, when I was talking with Agent

15:46:51  9    Hart, and I asked him:  Is this -- is this the definition,

15:46:55  10   the elements of the crime?  And he said:  Well, no.

15:46:59  11            And he knows this, because he went to law

15:47:03  12   school, he graduated from law school.  He's a federal law

15:47:07  13   enforcement officer who understands the law, and he

15:47:11  14   understands, but it had to come out on cross-examination that

15:47:16  15   that definition of "dealing" is just the definition of

15:47:20  16   "dealing."

15:47:21  17            If you're not acting wilfully, and the

15:47:24  18   government can't prove it beyond a reasonable doubt the fact

15:47:27  19   that you do every single thing in this definition doesn't

15:47:31  20   mean that you're guilty of a crime.

15:47:38  21            The government wants you to look at the

15:47:42  22   excerpts that were played to you of Officer Arao in that

15:47:49  23   58-minute conversation, the one minute excerpt.  And that

15:47:55  24   excerpt -- try to say that ten times -- the excerpt mirrors

15:48:04  25   what's in definition 16.  And Officer Arao said:  Yes, I was

15:48:11  1    selling those off-roster handguns in private party transfers

15:48:16  2    for money.  We have never, ever contested that.

15:48:21  3              Now, if there had been evidence in that

15:48:24  4    58-minute conversation that shows that Officer Arao acted

15:48:28  5    willfully and that he knew he was violating the law when he

15:48:33  6    was doing that, then you certainly would have heard about it,

15:48:40  7    and you'd be required to hear about it because it's the

15:48:43  8    government's burden of proof.  And the absence of that 57

15:48:48  9    minutes, you can rely on that to determine that there was

15:48:54  10   nothing in that part of the conversation between the agents

15:48:57  11   and Officer Arao that would show in any way that Officer Arao

15:49:03  12   was acting willfully, that he knew was violating the law.

15:49:10  13             And so, we have these 41 private party

15:49:13  14   transfers over a two-year period.  Less than two a month.

15:49:17  15   And we're not arguing that he wasn't engaged in dealing.

15:49:22  16   Please don't misunderstanding that.  But you need to look to

15:49:30  17   see whether or not the government has proven willfulness

15:49:33  18   beyond a reasonable doubt by looking at what the law is in

15:49:36  19   California.

15:49:36  20             The law in California prohibits the selling

15:49:40  21   of off-roster firearms to the general public.  This is

15:49:44  22   Exhibit 202.  California law permits the selling of

15:49:51  23   off-roster firearms to exempted parties, police officers, for

15:49:54  24   use in the discharge of their official duties.  And

15:49:58  25   California law requires that -- excuse me.

15:50:02   1          California law permits the selling of

15:50:05   2   off-roster firearms through private party transfers.  This is

15:50:10   3   the law.  A private party transfer occurs when the transferor

15:50:15   4   and the transferee of the firearm were not licensed firearm

15:50:20   5   dealers.

15:50:20   6          In California, under the private party law,

15:50:23   7   and that's exactly what Officer Arao was doing, you don't

15:50:28   8   need to be licensed.  It is an exception to the licensing

15:50:33   9   requirement.  And at a minimum, if that's what Officer Arao

15:50:39   10  is doing, and he's doing it openly, with no effort to hide

15:50:43   11  it, if he is DROSing and 4473ing every single one of those

15:50:50   12  private party transfers, how on earth is he trying to hide

15:50:53   13  what he's doing?

15:50:55   14          Officer Arao was telling the federal

15:50:57   15  government and he was telling the California government:  I

15:51:00   16  am doing this.  And I'm making sure that these guns do not

15:51:06   17  end up in the hands of the wrong people, to comply with the

15:51:08   18  law.

15:51:11   19          Now, Exhibit 32, it's a 90-page exhibit.

15:51:20   20  This is Ronin Tactical's acquisition and disposition record

15:51:25   21  book, and it has Ronin Tactical's acquisition and disposition

15:51:29   22  of firearms.

15:51:34   23          If there was anything that tells you that

15:51:40   24  Officer Arao was doing what he believed was right, that

15:51:46   25  exhibit shows.  And remember I asked you to think and to

```
15:51:50   1    remember three things.  One of those things was he was

15:51:53   2    quietly committing the crime?  My goodness, these sales and

15:51:57   3    transfers of the guns are published in the dealer record of

15:52:01   4    sales, in the DROS information that goes to California

15:52:08   5    Department of Justice and in the federal database the NCIS.

15:52:13   6    All of them are screaming out loud, nothing quite about it,

15:52:18   7    that:  I am following the law.

15:52:21   8                Now, I anticipate that the government will

15:52:23   9    say:  Well, under California law, the exempted parties,

15:52:31  10    including police officers, can get these off-roster guns for

15:52:35  11    use in the discharge of their official duties.  That's the

15:52:39  12    law, and so is the private party transfer law.  They appear

15:52:44  13    to act independently, but the fact of the matter is, the

15:52:48  14    government has to prove beyond a reasonable doubt that

15:52:50  15    Officer Arao knew that what he was doing was unlawful.

15:52:56  16                Do not be misled.  If there was any witness

15:53:01  17    at all from any police department, from the auditor from the

15:53:01  18    ATF, from any expert, anyone in the California Department of

15:53:17  19    Justice, anybody in the United States Department of Justice

15:53:20  20    who would have been able to say:  You know what?  He knew

15:53:23  21    about the limitation on the police officer exemption, you

15:53:26  22    would have heard about it.  And I guarantee you that if

15:53:32  23    Officer Arao had known about that limitation, there would

15:53:35  24    have been some effort on his part, some effort on his part to

15:53:40  25    hide what he was doing.  Because that's what people do when
```

15:53:43   1    they know they're violating the law, and they don't want to

15:53:46   2    get caught.  And there was nothing in this case to support

15:53:50   3    that, not a single thing.  So, please do not be misled if

15:53:55   4    that comes up in the government's rebuttal argument.  They

15:54:01   5    have to prove beyond a reasonable doubt that he knew he was

15:54:04   6    violating the law.

15:54:11   7               And so -- this is critical, and I'm going to

15:54:13   8    end with this.  Please look at Exhibit 205.  Exhibit 205 is

15:54:19   9    the government's exhibit, and on page 8 of 8, which was not

15:54:24  10    shown to you on the screen, Agent Duncan, who had gone

15:54:36  11    undercover in that --

15:54:40  12               Look, I'm not saying there is anything wrong

15:54:43  13    with doing undercover operations.  It's legal.  But nothing

15:54:47  14    at all came of it.  How do you know nothing came of it?

15:54:52  15    Because they didn't put a tape to you -- but also officer --

15:55:01  16    Agent Duncan says to the38superman:  *Hey, sorry, man, I went*

15:55:02  17    *back, but I didn't have my FSC, my firearm safety card*.  *So*

15:55:07  18    *Eddie, in effect, would not give me the gun*.  Agent Duncan

15:55:12  19    says:  *Sorry for wasting your time.  I'm still getting used*

15:55:16  20    *to these California laws*.

15:55:22  21               Now, California laws, as you heard in the

15:55:27  22    judicial notice section, are different from the federal laws.

15:55:35  23    Officer Arao is a California police officer.  He's not a

15:55:40  24    federal officer.  He is working in the City of Gardena.  And

15:55:46  25    you will see in the evidence, he's got his business license,

15:55:49  1    he's got his employee identification number, he's got his
15:55:53  2    franchise tax board number, he's got his board of
15:55:58  3    equalization account.  He has done every single thing the law
15:56:06  4    requires so that he can operate openly, and to use a phrase,
15:56:13  5    loudly, and not quietly.
15:56:18  6              And so, there is -- and excuse the crudeness
15:56:22  7    of this approach, but this is what I'm used to as opposed to
15:56:26  8    the stuff on the screen.  This is Exhibit 185.  All right?
15:56:31  9    And all of you have seen it in front of you.  And the first
15:56:35  10   page on Exhibit 185 is a letter from the ATF, the Bureau of
15:56:41  11   Alcohol, Tobacco, Firearms and Explosives, the federal agency
15:56:47  12   that regulates firearms.  And it's from the Department of
15:56:52  13   Justice, and it's on their letterhead from the special agent
15:56:56  14   in charge of the Los Angeles field division.
15:56:59  15             Read this letter.  It says:  *Our concern is
15:57:02  16   that law enforcement officers are purchasing and reselling
15:57:04  17   firearms in possible violation of federal law.*
15:57:10  18             And it's the ATF's goal to educate the local
15:57:14  19   officers on what the law is.  In other words, what -- what's
15:57:20  20   the reconciliation between the state laws and the federal
15:57:25  21   laws?
15:57:25  22             And here it says:  In some instance -- the
15:57:29  23   second paragraph -- the ATF has discovered officers who
15:57:32  24   purchased more than 100 off-roster firearms that were
15:57:37  25   subsequently transferred to non-law enforcement individuals.

15:57:42   1          All right?  More than double what Officer

15:57:45   2   Arao did in those two years:  And such transactions to

15:57:53   3   transfer the off-roster firearms to non-law enforcement

15:57:57   4   purchasers, so it's for profit -- potentially constitutes a

15:58:04   5   violation of federal law.

15:58:05   6          Now, when I told you that the ATF said:

15:58:09   7   Look, these are possible violations, these are potential

15:58:12   8   violations, but we're here to educate you.  The reason the

15:58:15   9   ATF is there to educate is because in a case like this, the

15:58:21  10   officers have to act willfully.  The mere dealing of the

15:58:24  11   firearms is not enough.  They must act willfully, and in a

15:58:31  12   criminal prosecution, the government has to prove beyond a

15:58:39  13   reasonable doubt they knew they're violating the law.  They

15:58:42  14   didn't even come close with respect to Officer Arao.

15:58:46  15          And there, is by the way, unlike a different

15:58:49  16   situation, there is no evidence presented to you, none

15:58:53  17   whatsoever that Officer Arao ever saw Exhibit 185.  And I

15:58:56  18   guarantee you, I guarantee you, had there been, had it been a

15:59:03  19   fellow police officer, maybe a sergeant at the Gardena Police

15:59:07  20   Department, had it been an ATF employee who held a seminar,

15:59:12  21   there is a sign-in sheet, had there been a photograph of this

15:59:16  22   posted up on the wall at the Gardena Police Department, you

15:59:20  23   would have heard about it, you would have heard about it.

15:59:24  24   And you know that the government went to extensive efforts to

15:59:28  25   investigate this case, but there is no evidence that Officer

15:59:33  1    Arao ever saw or heard about this letter, not that it hurts

15:59:40  2    him, because it sounds like the ATF says:  Potentially or

15:59:43  3    possibly we have some problems here.  Let's teach you how to

15:59:48  4    do this correctly.

15:59:49  5              Now, here is where the irony gets really,

15:59:54  6    really thick.  The second two things I asked you to remember

15:59:58  7    when I started my statement was that the prosecution in their

16:00:02  8    opening statement said:  Because Officer Arao is a police

16:00:06  9    officer, it's his job to know the law.  As if it's some kind

16:00:12  10   of strict liability situation.  He's a police officer in the

16:00:16  11   City of Gardena, arresting people for DUIs and concealed

16:00:21  12   handguns.  He's supposed to know the complexity of the

16:00:25  13   relationship between the federal laws and the state laws, all

16:00:30  14   right?  And he's the responsible party for an FFL, he's

16:00:34  15   supposed to know that same complexity, and then go out and

16:00:39  16   try to violate the law.

16:00:43  17             And the third thing that I asked you to

16:00:45  18   remember was where you were told that the bottom line -- and

16:00:51  19   this is the government's effort to misdirect this

16:00:55  20   situation -- the bottom line is that you can't sell a gun, an

16:00:59  21   off-roster gun in California without a license.

16:01:03  22             How on earth can they say that to you?  When

16:01:07  23   Judge Otero read you the California law in the judicial

16:01:11  24   notice Exhibit 202.  Yes, you can.  Yes, you absolutely can.

16:01:17  25   Look at that, in a private party transfer, neither the

| | | |
|---|---|---|
| 16:01:22 | 1 | seller, the buyer has to be licensed.  That's what the law |
| 16:01:27 | 2 | says, and that's how Officer Arao was conducting his |
| 16:01:32 | 3 | business, because he was DROSing a 4473ing every single one, |
| 16:01:36 | 4 | and he made no effort to hide it, because he felt he was |
| 16:01:40 | 5 | following the law, acting in good faith. |
| 16:01:44 | 6 | But, now I'm going to defer to technology |
| 16:01:47 | 7 | here because I have to. |
| 16:01:57 | 8 | This is the second page of Exhibit 185.  And |
| 16:02:03 | 9 | I'm asking you to appreciate the irony of the government's |
| 16:02:09 | 10 | statement to you about what is the bottom line in selling |
| 16:02:13 | 11 | firearms that you can't without a license in California. |
| 16:02:16 | 12 | This is a law enforcement advisory coming |
| 16:02:22 | 13 | from the United States Department of Justice, Bureau of |
| 16:02:28 | 14 | Alcohol, Tobacco, Firearms and Explosives. |
| 16:02:29 | 15 | Please look at the highlighted portion.  And |
| 16:02:31 | 16 | I'm going to read it.  "A law enforcement official who |
| 16:02:36 | 17 | regularly acquires off-roster firearms and sells or disposes |
| 16:02:40 | 18 | of them for a profit is engaging in the business of a dealer |
| 16:02:48 | 19 | in firearm." |
| 16:02:48 | 20 | That's true.  There's nothing about the |
| 16:02:49 | 21 | "willfulness" part.  Keep that in mind, please. |
| 16:02:54 | 22 | "And must be licensed." |
| 16:02:57 | 23 | The ATF in their law enforcement advisory is |
| 16:03:02 | 24 | telling these law enforcement officers:  Hey, if you're going |
| 16:03:05 | 25 | to sell these off-roster guns to the public, you need to be |

16:03:08  1    licensed.

16:03:09  2               Well, guess what?  In California, you can't

16:03:12  3    do that.  Look at the judicial notice section.  In California

16:03:19  4    it doesn't matter whether you have a license or not.  That's

16:03:23  5    the private party exception.

16:03:25  6               And so when the government asks you to find

16:03:27  7    that they have proven their case against Officer Arao beyond

16:03:32  8    a reasonable doubt with respect to wilfulness, please

16:03:37  9    consider the -- the unimaginable irony here that ATF has the

16:03:44  10   law wrong.  They have the law wrong.

16:03:53  11              And so if ATF has the law wrong, and

16:03:56  12   California does in fact say, unlike what you've been told,

16:04:00  13   the bottom line is, that in a private party transfer you can

16:04:04  14   sell a gun if you're not licensed so long as you DROSed it

16:04:10  15   and 4473 it, like Officer Arao did.  And there is no

16:04:12  16   evidence, affirmative evidence whatsoever that Officer Arao

16:04:16  17   knew that the -- the police officer exception said:  Hey,

16:04:20  18   only for use in your private -- in your personal duties,

16:04:24  19   because if there had been that evidence, you certainly would

16:04:27  20   have heard of it.  All you have left is what Officer Arao

16:04:34  21   did, and he every single thing to comply with the law as he

16:04:41  22   knew it, and he did absolutely nothing to hide what he was

16:04:47  23   doing or to violate the law.

16:04:52  24              And so, ladies and gentlemen, the government

16:04:54  25   has failed to prove their case against Officer Arao.  They

16:05:00  1   have failed to prove beyond a reasonable doubt, to any doubt,

16:05:06  2   really, but beyond a reasonable doubt, that Officer Arao

16:05:09  3   acted willfully, and he knew he was violating the law.  It's

16:05:14  4   almost absurd.

16:05:20  5          Your job is to render justice, and I try not

16:05:23  6   to be corny, but please bear with me.

16:05:28  7          Chief Justice Jackson who was the chief

16:05:30  8   prosecutor in the Nuremberg prosecutions, he understood the

16:05:35  9   gravity his responsibility to do justice.  Can you imagine

16:05:38  10  what he had to go through?  But he was professional.  He

16:05:42  11  proved his case.  He was methodical.  And if he didn't have

16:05:47  12  the evidence, he didn't seek to misdirect the question.

16:05:52  13         He's famous for one statement that I know of.

16:05:56  14  I'm sure he's famous for a lot more.  And I'm paraphrasing

16:06:00  15  now, but Chief Justice Jackson said:  *The government, because*

16:06:06  16  *their job is to pursue justice within the construct of*

16:06:09  17  *proving their case beyond a reasonable doubt with the*

16:06:11  18  *presumption of innocence and then bearing the burden of proof*

16:06:14  19  *may strike hard blows, yes, they can; but they cannot strike*

16:06:19  20  *foul ones.*

16:06:22  21         And I would suggest to you -- I'm not

16:06:27  22  claiming that the government acted in bad faith here, but I'm

16:06:30  23  saying that their desire to win has caused them to present to

16:06:35  24  you a case that makes it so -- just because Officer Arao is a

16:06:41  25  police officer, he should have known the law, and the ATF

16:06:43  1   doesn't even understand the law.  As well as going on with

16:06:49  2   potentially, it was possibly.  Please study that.

16:06:53  3              And so, finally, we have a -- we have a man

16:06:57  4   here who's dedicated his life to serving us, he's dedicated

16:07:04  5   himself to following the law.  You know that, you've seen it,

16:07:08  6   it's glaringly obvious.  It's not right that he's sitting

16:07:14  7   here.

16:07:14  8              The government has failed to prove their

16:07:19  9   case, and I'm going to ask you to return the only verdict you

16:07:22  10  can against Officer Arao on both charges, and that is not

16:07:26  11  guilty.

16:07:26  12             Thank you.  Thank you, Your Honor.

16:07:28  13        **THE COURT:**  Thank you, Mr. Robinson.

16:07:30  14             Mr. Rodriguez.

16:07:33  15        **MR. RODRIGUEZ:**  Your Honor, may I have a minute

16:07:36  16  just to set up?

16:07:37  17        **THE COURT:**  Certainly.

16:09:02  18        (CLOSING ARGUMENT BY MR. RODRIGUEZ)

16:09:02  19        **MR. RODRIGUEZ:**  Good afternoon, ladies and

16:09:06  20  gentlemen.

16:09:06  21             To me, one of the most important things that

16:09:09  22  were said during this trial, and it's --

16:09:14  23             Well, it's always been the case that in every

16:09:16  24  trial sometimes the most telling part of the case comes from

16:09:23  25  most unexpected place.  And in this case it actually came

16:09:27  1   from Pelayo, and when Mr. Pelayo said: *I didn't put the*

16:09:33  2   *puzzled pieces together like that.*

16:09:35  3            Because the amount of time, energy and

16:09:40  4   resources that the government has used in order to frame an

16:09:44  5   innocent man in this case comes down to what Pelayo said: *I*

16:09:51  6   *didn't put the puzzled pieces together like that.*  And it is

16:09:54  7   my job today, in my closing argument, to help you put the

16:09:59  8   pieces together like that, to show you the steps that they

16:10:03  9   have gone through in order to mislead you.

16:10:06  10            There is something that I want you to know.

16:10:11  11   Every witness that a prosecutor puts on the stand is there to

16:10:17  12   get you to convict -- not to entertain you, not to educate

16:10:21  13   you -- to convict.

16:10:24  14            So, as you listen to my argument, and I know

16:10:27  15   it's late, and I appreciate it, as you listen to what I'm

16:10:31  16   about to tell you, and putting it all together, is think

16:10:34  17   about the time, the energy and resources they spent

16:10:39  18   misleading you.

16:10:40  19            Okay, now, in order to convict Carlos

16:10:44  20   Fernandez, they have to prove certain things beyond a

16:10:48  21   reasonable doubt, and I'll talk about what "beyond a

16:10:51  22   reasonable doubt" means at the end of my argument.

16:10:53  23            And there are three different parts of this

16:10:55  24   case, and the first one, Mr. Robinson argued extremely

16:10:59  25   eloquently just now, and it's hard to follow that, which is

16:11:03   1    the wilfulness part that is required for the government to

16:11:06   2    prove beyond a reasonable doubt, that Carlos Fernandez

16:11:16   3    wilfully violated the law.

16:11:17   4             Now, as just stated, this isn't a situation

16:11:21   5    like a murder case where somebody takes a gun, points at

16:11:26   6    somebody, shoots them.  Right?  It's clear what's going on.

16:11:30   7    This is a highly regulated field.  It's so regulated that

16:11:37   8    there is an actually department, there's a federal agency

16:11:40   9    called Alcohol, Tobacco and Firearms just to regulate booze

16:11:42   10   and cigarettes and guns.  In California we have our own

16:11:47   11   Department of Justice to regular guns as well.

16:11:50   12            There are hundreds and thousands of makes,

16:11:54   13   models, antiques -- I mean, the list goes on of the number of

16:11:59   14   guns that are available and how to regulate it, whether or

16:12:04   15   not they're automatic, semiautomatic, both action rifles,

16:12:09   16   long guns, short guns.  It goes on and on and on.  And so

16:12:13   17   that's why the law requires that the government prove beyond

16:12:13   18   a reasonable doubt that defendant Carlos Fernandez acted

16:12:20   19   willfully, that is, he knew he was violating the law.

16:12:22   20            So, let's look at how Carlos Fernandez went

16:12:25   21   about this.  He filled out every form that was required,

16:12:30   22   every -- is it 4473 -- I forgot the number, 4773s.

16:12:36   23            They told me there was going to be no math in

16:12:40   24   law school.

16:12:40   25            4473.  Every single one, he filled out.  The

16:12:45  1   DROS, whatsoever forms was required to fill out in every

16:12:48  2   sale, he filled it out by turning those forms in to the

16:12:55  3   federal government.  When those forms were filled out, they

16:12:58  4   would go into the a database, both in the State of California

16:13:02  5   and the federal government.

16:13:03  6             Again, this is someone who's wilfully

16:13:06  7   violating the law by turning in forms to both governments in

16:13:11  8   order to create a record.

16:13:18  9             By partnering up with other FFLs, either

16:13:22 10   doing transactions at Norman's -- not Norman's -- Turner's,

16:13:23 11   or through Ronin Tactical, in order to lead up, to follow the

16:13:29 12   law as required in order to create a record of every purchase

16:13:33 13   ever made.

16:13:37 14             There is no evidence of any guns sold by

16:13:40 15   Carlos Fernandez that weren't recorded.  None.  In fact, all

16:13:47 16   the guns that they claim that they argue that they used in

16:13:50 17   order to try to get you to convict Carlos Fernandez were

16:13:57 18   recorded.

16:13:59 19             So -- and in this ongoing process of

16:14:04 20   supposedly willfully violating the law, he sets up an

16:14:09 21   Instagram account, a public Instagram account, with an actual

16:14:16 22   hashtag.  So, anything who's looking for a 1911 Super .38

16:14:22 23   handgun can find him.  He engages people, he goes to gun

16:14:29 24   shows.  He has a T-shirt.  He is about as open as he can

16:14:34 25   politic be, saying:  I sell 1911 Super .38s.

UNITED STATES DISTRICT COURT

16:14:40  1          There is no hiding, and that's a great point

16:14:43  2   that Mr. Robinson made.  People who wilfully commit crimes

16:14:48  3   hide their crimes.  We in the law call that consciousness of

16:14:55  4   guilt.  Someone who's embezzling money from their boss will

16:15:00  5   hide that.  Someone who's stealing from their partner will

16:15:03  6   hide that.  Right?  A person who cheats you, hides it.

16:15:10  7          When you get a call from a telemarketer,

16:15:13  8   they're not telling you they're going to rip you off.  They

16:15:17  9   tell you they got a great deal for you.  Right?

16:15:21  10          We have the exact opposite of this.  These --

16:15:24  11   Carlos Fernandez operated in the daylight, because he thought

16:15:29  12   he was doing everything that the law required, that he was

16:15:35  13   following the oath that he swore to take 18 years ago, the

16:15:41  14   oath that he remembered every morning when he put on that

16:15:46  15   uniform and went to work.

16:15:51  16          And I don't know how many of you who have

16:15:53  17   cops as family, but that is a solemn duty, to put on that

16:15:58  18   uniform and leave the house, because you know you're not

16:16:01  19   guarantied to come home.

16:16:11  20          One thing is to argue that Carlos Fernandez

16:16:14  21   is a crooked cop and broke the law; it's quite another and

16:16:21  22   quite a stretch to say that he's so dumb.  Because that's

16:16:27  23   basically what they're saying.  They're saying he's so dumb,

16:16:36  24   that he wilfully violated the law and made a record of every

16:16:39  25   transaction.

16:16:39   1            Throughout -- throughout this case, there has

16:16:43   2   been the use of evidence that doesn't apply, that isn't true,

16:16:52   3   that's misleading, that uses innuendo in order to confuse you

16:16:57   4   and to bamboozle you.

16:17:04   5            Special Agent Hart testified on Thursday.

16:17:10   6   Now, when you have -- when the prosecution puts on their

16:17:14   7   investigating officer, right, their lead investigator, the

16:17:16   8   one that kind of puts the case together, that's supposed to

16:17:19   9   be your perfect witness.  That's the witness --

16:17:22   10           Because witnesses come in, they might change

16:17:24   11  their story, they don't testify well, they don't know how to

16:17:27   12  make eye contact, whatever.  The investigating officer is

16:17:30   13  supposed to come in here and lay it all out for you, saying:

16:17:34   14  Listen, this is what I do, I put this case together.  Here is

16:17:38   15  the evidence, here is the road map to conviction.

16:17:44   16           Their best witness testified about a chart

16:17:50   17  that I can't believe they used again in closing argument,

16:17:53   18  about guns purchased, and then the -- with the markup and the

16:17:58   19  advertised price for a total, what, $39,000 and change, six

16:18:04   20  of those guns were never sold, and then that was compared

16:18:08   21  next to the deposits at Chase Bank account that equal almost

16:18:15   22  the same amount.

16:18:17   23           And the entire reason they did that was to

16:18:19   24  get you to think that all those guns were sold, all that

16:18:23   25  money was made, and all that money went into his bank

16:18:23  1    account.
16:18:26  2                    And that was a lie.  That is -- I am not
16:18:32  3    afraid to say that, that is bad faith, that that was
16:18:36  4    malfeasance, that you are being cheated and lied.  That in
16:18:41  5    this court -- to me --
16:18:42  6                    Look, I'm way cornier than Mr. Robinson.  To
16:18:47  7    me, this is a sacrad place.  This is a hallowed, secular
16:18:52  8    place of justice.
16:18:53  9                    I love being a lawyer.
16:18:55  10                   And to put on a federal agent in that stand
16:18:59  11   under oath and question him about something to give you the
16:19:03  12   impression -- because with so many guns and so many serial
16:19:13  13   numbers, it's pretty easy for a lawyer not to notice, but I
16:19:16  14   did.  I'm old, but I'm not dumb.  And they would have gotten
16:19:27  15   away with it.  And you would have been left with an
16:19:30  16   impression and a reason to convict, and a feeling in your gut
16:19:36  17   that there was something wrong, and the only thing was wrong
16:19:40  18   was what they tried to do to you and what they want to do to
16:19:45  19   him because what it means to be able to convict a cop when
16:19:49  20   you're a prosecutor.  Yeah, I said it.  That's absolutely
16:19:53  21   true.
16:19:57  22                   This isn't about justice.  This is about
16:20:00  23   ending Carlos Fernandez's career in exchange for theirs.  And
16:20:13  24   what is baffling to me is that --
16:20:19  25                   Look, let me show you something.  You see

| | |
|---|---|
| 16:20:22 | 1 |
| 16:20:27 | 2 |
| 16:20:31 | 3 |
| 16:20:37 | 4 |
| 16:20:41 | 5 |
| 16:20:46 | 6 |

these?  They've been moving them around, these three binders?

They're extremely heavy.  You need lumbar support to move

them, okay?  Out of all of these exhibits, right, the one

thing they came up and showed you or one of the things that

they made a, you know, big poster and had it framed, was

misleading and a lie.

            The other one with the Chase deposits, they

have no idea who made the deposits, they have no idea where

the money came from, they didn't bother to look at his

credit -- what do they call -- credit bureau?  No.  Credit

union.  Thank you.  Credit union account or his wife's credit

union account.  Right?

            Look at this.  Right?  Because the rest here,

the huge majority are just forms that were signed and turned

into both the federal and the state government.  And then

they tried, after all that, after Thursday what -- in a way

it was kind of insulting -- is that they tried to do it

again, again, with showing you those text messages and those

pictures between Camacho, Jr. and Karina.

            And what did they show you repeatedly over

and over and over again?

            I'm trying to get these without papers, I'm

trying to get these without papers, right?  I mean that's

what Junior is trying to do, he's trying to get them without

papers.  Obviously he's got something to do with it.  Right?

16:22:07  1    Right?  It's going to be shown to you.  Right?  I mean, this

16:22:11  2    is being thrown in front of you, it's like red meat, a gun

16:22:15  3    without papers, like, that's a big deal, right?  With a

16:22:20  4    photograph of a gun that they knew was sold with papers.

16:22:31  5              When they give you evidence like that, that

16:22:37  6    is misleading, that is there to create -- not only

16:22:42  7    misleading, it never happened.  And not only that, Carlos

16:22:47  8    Fernandez had no idea what Camacho, Jr. says to his

16:22:51  9    girlfriend.  None.  There is absolutely no evidence, no proof

16:22:57  10   not even an iota, no even a hint, that Carlos Fernandez has

16:23:02  11   any knowledge what his -- Camacho, Jr. and Karina say to each

16:23:07  12   other, let alone text.  Right?

16:23:09  13             You have to ask yourself again and again:

16:23:30  14   Why would they do that?  Why after Thursday's debacle would

16:23:34  15   they try to mislead me again?  Why would they try to give me

16:23:39  16   the impression of something that didn't happen?

16:23:51  17             I'll let you answer that for yourselves, but

16:23:54  18   I'll suggest this:  That when lawyers know that they're

16:23:59  19   losing a case, sometimes they try desperate measures.

16:24:09  20   Sometimes they will try foul blows.

16:24:19  21             The first witness that we heard about, I have

16:24:23  22   no idea why he was called to testify.  Mr. -- this

16:24:31  23   is Tuesday, Wednesday?  About a week ago.  Mr. Cervantes

16:24:35  24   Corona, which we haven't talked about much, came in and

16:24:38  25   testified and said that he bought two guns, and that he

16:24:41  1    gave -- and one of the guns he bought for a buddy of his who

16:24:47  2    could have a gun, they knew he was being -- he knew his

16:24:54  3    friend couldn't have a gun.

16:24:54  4              Absolutely no evidence that Carlos Fernandez

16:24:57  5    knew anything about that.  He couldn't even identify Carlos

16:25:01  6    Fernandez.  Do you see Carlos Fernandez in the courtroom?

16:25:05  7    Never asked.

16:25:05  8              And he had a -- he had a felony, and he had

16:25:07  9    to testify, and he had to cooperate.  And even with all of

16:25:11  10   that, he never once said Carlos Fernandez knew.  Because if

16:25:17  11   he would, they would have asked him that question.

16:25:21  12             So, the fact that someone -- that Carlos

16:25:24  13   Fernandez does not know, commits a crime all by himself, has

16:25:30  14   nothing to do it, right, in no way convicts my client.  Then

16:25:41  15   why?  To dirty him up, to make him look bad.  The badder

16:25:46  16   [sic] he looks -- the badder -- the worse he looks, right,

16:25:47  17   the more you're going to think, ah, maybe, ah, close enough.

16:25:53  18   That is jury manipulation.  That is not fair.  That is not

16:25:59  19   just.

16:26:06  20             So, ladies and gentlemen, I suggest that you

16:26:09  21   completely disregard the testimony of Cervantes Corona.  It

16:26:16  22   has absolutely nothing to do with this case.  There is no tie

16:26:21  23   to my client in any of the counts.  None, whatsoever.

16:26:28  24             Now, let's talk about Mr. Pelayo.

16:26:31  25   Mr. Pelayo --

16:26:40    1                   When we finished up last Thursday, on that
16:26:46    2       day, on that Thursday afternoon, Mr. Pelayo was cagey and
16:26:54    3       nervous.  And by that time he got here, he got back here on
16:26:57    4       Monday, he was terrified, and he was terrified about one
16:27:02    5       particular thing, about saying the wrong thing and messing up
16:27:09    6       his deal because Albert Pelayo is owned by the federal
16:27:16    7       government.  They own him.  His entire freedom, and whether
16:27:19    8       or not he gets to be home for Christmas, whether or not he
16:27:22    9       gets to see his son being born, whether or not he gets to do
16:27:27   10       all the things that are heartbreakingly beautiful as a
16:27:34   11       parent, when a baby comes into this world, all those things,
16:27:38   12       whether he gets to experience them or whether or not he's in
16:27:42   13       a federal penitentiary is up to them, and he knows that.
16:27:48   14       Right?  And it's not just him, it's his wife, too, right?
16:27:54   15       Because they got -- they got Bianca too.
16:28:04   16                   Look, Pelayo is just a dude from Norwalk.
16:28:09   17       That's the best way to describe him.  He's a regular guy from
16:28:12   18       Norwalk who had a DUI, who did something stupid, and now he's
16:28:17   19       a felon for it, and he'll be a felon for the rest of his
16:28:20   20       life.
16:28:20   21                   And the government was willing to sacrifice
16:28:24   22       Adalberto Pelayo future -- because his future is not the same
16:28:29   23       that it would have been, right?  In his ability to make money
16:28:31   24       and provide for his family.  In order to have a witness under
16:28:32   25       their grip to try to convict him.

| | | |
|---|---|---|
| 16:28:38 | 1 | Pelayo is collateral damage and proof of what |
| 16:28:43 | 2 | government can and will do when it wants something. |
| 16:28:53 | 3 | Pelayo lied when he said that him and Bianca |
| 16:28:55 | 4 | didn't talk about it.  There is absolutely -- everyone who's |
| 16:29:01 | 5 | been married and especially those who have been married more |
| 16:29:05 | 6 | than once, know that there is no way that a couple who both |
| 16:29:09 | 7 | are looking at felony charges in federal government, in this |
| 16:29:13 | 8 | room, are not talking about it all the time. |
| 16:29:19 | 9 | You try to find things not to talk about, |
| 16:29:22 | 10 | right?  It's like fighting -- it's -- |
| 16:29:25 | 11 | I am being compared being charged by the |
| 16:29:30 | 12 | federal government -- and I hope no one takes offense to this |
| 16:29:36 | 13 | if you or your family have gone through this, to having |
| 16:29:37 | 14 | cancer.  It is that big of a deal.  And instead of doctors, |
| 16:29:41 | 15 | you have lawyers to deal with. |
| 16:29:42 | 16 | They -- Bianca and Adalberto might have found |
| 16:29:47 | 17 | things to talk about other than this, but this is something |
| 16:29:51 | 18 | they talked about.  And for him to say that when she got a |
| 16:29:55 | 19 | letter saying you'll get diversion if you just behave, right? |
| 16:30:01 | 20 | Let's kind of waive this in front of you.  And that letter |
| 16:30:06 | 21 | was mailed -- this is -- this is evidence you'll have, |
| 16:30:10 | 22 | exhibits you'll have.  On October 25th, just a few days |
| 16:30:15 | 23 | later, he goes in and gives a different statement than he |
| 16:30:20 | 24 | gave a year -- about a year and a half before that, right? |
| 16:30:24 | 25 | And it just so happens that he makes a statement, as Agent |

| | | |
|---|---|---|
| 16:30:33 | 1 | Hart testified, that he never said before. |
| 16:30:35 | 2 | But wait.  That statement was in his plea |
| 16:30:39 | 3 | that he signed in September of 2018.  And who wrote the plea? |
| 16:30:48 | 4 | Who wrote the script? |
| 16:30:57 | 5 | He changes or amends his statements at more |
| 16:31:01 | 6 | than a year after the fact because they realized that the |
| 16:31:05 | 7 | script that they wrote for him in order to get him to flip, |
| 16:31:09 | 8 | in order to get him to lie.  He hadn't said that, so they had |
| 16:31:18 | 9 | to fix it. |
| 16:31:20 | 10 | And by the way, did you notice that he was -- |
| 16:31:25 | 11 | if he was supposedly lying to the ATF, was he ever charged |
| 16:31:29 | 12 | with lying to the ATF?  No. |
| 16:31:46 | 13 | Let's talk about Camacho, Jr. |
| 16:32:08 | 14 | In the opening statement, Ms. Dragalin |
| 16:32:12 | 15 | stated, quote: *Evidence will show Fernandez knew Camacho was* |
| 16:32:16 | 16 | *a felon and that guns were for him.* |
| 16:32:19 | 17 | There is no evidence that Carlos Fernandez |
| 16:32:24 | 18 | knew that Camacho, Jr. was a felon.  None. |
| 16:32:31 | 19 | You've looked at all the text messages that |
| 16:32:33 | 20 | they've shown you.  There is no evidence that he knew that -- |
| 16:32:37 | 21 | that Fernandez knew that Camacho, Jr. was a felon. |
| 16:32:43 | 22 | They want you to assume, they want you to |
| 16:32:48 | 23 | guess, they want you to trust them, they want you to make a |
| 16:32:52 | 24 | leap, they want you to think that Carlos Fernandez was ready |
| 16:32:56 | 25 | to betray his badge and throw away an 18-year career to sell |

UNITED STATES DISTRICT COURT

16:33:05   1   guns that were extremely popular, right?  You could tell that

16:33:09   2   from all the stuff that we saw.  He didn't lack customers, he

16:33:16   3   didn't lack shelter, he didn't have money problems.  He did

16:33:19   4   not -- he was not a desperate man trying to make a buck and

16:33:25   5   sell a gun to whomever.  These guns are collector items.

16:33:31   6   These guns are extremely expensive.  These guns have a

16:33:38   7   market.

16:33:39   8              There is no evidence that Carlos Fernandez

16:33:42   9   knew Camacho, Jr. was a felon.  All the evidence shows is

16:33:48  10   that the Camachos would come down, they would buy guns, and

16:33:54  11   Camacho, Jr. would text and talk about the guns with Carlos

16:34:00  12   Fernandez.  So what?

16:34:03  13              The only -- according to the prosecution, the

16:34:06  14   only reason that this all happened was because Camacho, Jr.

16:34:17  15   was a felon, and that he must have known that they were for

16:34:21  16   him.  There is no evidence of that.

16:34:26  17              It could very well be that Camacho, Jr., that

16:34:28  18   his dad bought the guns because his dad liked the guns.

16:34:33  19   Period.  That is just as reasonable interpretation of the

16:34:36  20   evidence.

16:34:36  21              Camacho, Jr. is broke and lives in a messy

16:34:39  22   room with his girlfriend at his parents' house, in his late

16:34:45  23   20s.  Maybe he's not the kind of guy that has the money to

16:34:50  24   buy 7,000- or $5,000 guns, and it's something that him and

16:34:56  25   his dad do together.

16:34:58  1          None of it shows that Carlos Fernandez knew,

16:35:04  2  and that knew -- not just knew, knew beyond a reasonable

16:35:09  3  doubt, right?  Because they don't have to prove that he knew;

16:35:15  4  they had to prove that he knew beyond a reasonable doubt that

16:35:18  5  Camacho, Jr. was a felon.  They had to prove beyond a

16:35:23  6  reasonable doubt that Pelayo was telling you the truth even

16:35:30  7  though they had his life in their hands, even though when he

16:35:33  8  first was approached by the ATF, he denied three times,

16:35:40  9  right?  Like Peter in the garden.  That Carlos -- that he

16:35:44  10  told Carlos Fernandez about the DUI.  And now because --

16:35:54  11  because he had to change his story, you're supposed to

16:35:59  12  believe him.

16:36:01  13          Let me -- let me just end by saying I want to

16:36:05  14  thank each and every one of you.  It has been a long trial.

16:36:09  15  It has not been easy.  It is complicated.  The law, as

16:36:15  16  Mr. Robinson so eloquently explained, is complicated, it's

16:36:18  17  convoluted, it's confusing.

16:36:25  18          Your role as a juror in a criminal case is

16:36:30  19  the embodiment of the Constitution, and I know that sounds

16:36:35  20  corny, but please hear me out.  The Constitution of the

16:36:40  21  United States is a revolutionary document written by

16:36:43  22  revolutionaries that went to war against a king, won, and did

16:36:49  23  everything they could to set up a fair system where one of

16:36:54  24  the most important things is that the government wouldn't

16:36:59  25  have absolute power over us, and the things that they -- and

| | | |
|---|---|---|
| 16:37:06 | 1 | what they put in that to stop that, because they saw it |
| 16:37:10 | 2 | from -- they went to war with it -- for it, was the |
| 16:37:13 | 3 | government accusing people of crimes and convicting them on |
| 16:37:17 | 4 | flimsy evidence, an innuendo and misleading evidence. |
| 16:37:23 | 5 | That is the beauty of our Constitution, what |
| 16:37:26 | 6 | I call the sacred place.  And that's why we have the |
| 16:37:33 | 7 | presumption of innocence, and that's why anyone in America |
| 16:37:36 | 8 | accused of a crime has to be proven guilty beyond a |
| 16:37:41 | 9 | reasonable doubt, and that's why your role as a jury is not |
| 16:37:45 | 10 | just to question and doubt every piece of evidence that's |
| 16:37:52 | 11 | brought before you by the government, it is to question their |
| 16:37:57 | 12 | motives and their reason that they spent days trying to |
| 16:38:01 | 13 | mislead you and use propaganda and use misinformation to try |
| 16:38:07 | 14 | to get you to convict an innocent man and end the life as he |
| 16:38:14 | 15 | knows it. |
| 16:38:17 | 16 | Ladies and gentlemen, thank you so much.  And |
| 16:38:21 | 17 | I ask you to come back with the true verdict of not guilty on |
| 16:38:26 | 18 | all counts as to Carlos Fernandez. |
| 16:38:28 | 19 | Thank you so much. |
| 16:38:33 | 20 | THE COURT:  Thank you, Mr. Rodriguez. |
| 16:38:36 | 21 | You have 20 minutes. |
| 16:39:03 | 22 | (REBUTTAL CLOSING BY GOVERNMENT) |
| 16:39:17 | 23 | MS. DRAGALIN:  May I proceed, Your Honor? |
| 16:39:19 | 24 | THE COURT:  Please. |
| 16:39:19 | 25 | MS. DRAGALIN:  Good afternoon, ladies and |

16:39:20  1    gentlemen.  I'll start with responding to some of the

16:39:22  2    arguments raised by defendant Arao's counsel.

16:39:27  3              Now, he correctly stated the only issue as to

16:39:31  4    Mr. Arao that's been disputed in this case is:  Did he act

16:39:34  5    willfully when he engaged in the business of dealing firearms

16:39:40  6    without a license?

16:39:42  7              Now, the Court instructed you on the law.

16:39:47  8    What does it mean in the law to act wilfully.  The jury

16:39:52  9    instructions will be with you in the deliberation room.  The

16:39:56  10   instruction makes clear:  It requires proof that the

16:39:58  11   defendant knew that his conduct was unlawful.

16:40:03  12             In other words, when defendant Arao

16:40:06  13   repeatedly bought and then resold guns over and over again,

16:40:12  14   did he know that it was unlawful to engage in that conduct

16:40:18  15   without having a federal license?

16:40:21  16             In this case you have straightforward

16:40:26  17   evidence that this defendant knows that it's unlawful to deal

16:40:32  18   in firearms without a license.  You saw evidence of that in

16:40:37  19   multiple ways.  You saw evidence that defendant Arao applied

16:40:45  20   for a federal firearms license.

16:40:49  21             Ladies and gentlemen, a person who applies

16:40:52  22   for a federal firearms license understands that you need to

16:40:58  23   have a license to engage in the business of dealing firearms.

16:41:03  24             You saw evidence that defendant Arao not just

16:41:08  25   applied for it, he got a federal license to deal in firearms

16:41:11  1    for the corporation that he ran, the business that was a

16:41:16  2    legitimate FFL, Ronin Tactical.  He ran a business that is a

16:41:23  3    license under federal law that complied with federal law, he

16:41:28  4    knows there is a requirement to have a license to engage in

16:41:31  5    the business of dealing firearms.

16:41:34  6              You saw the Form 4473 many, many times during

16:41:41  7    this trial.  That's because this form is important.  It's the

16:41:46  8    record that has to be kept by an FFL, it's the record that

16:41:51  9    these two defendants signed over and over and over and over

16:41:54  10   again.  Every time you buy a gun, you have to sign this form.

16:41:59  11             And, ladies and gentlemen, that form, right

16:42:02  12   above the signature of the buyer says:  "I further understand

16:42:08  13   that the repetitive purchase of firearms for the purpose of

16:42:14  14   resale for livelihood and profit without a federal firearms

16:42:17  15   license is a violation of law."

16:42:23  16             That answers the question:  Did they know

16:42:27  17   that engaging in this conduct was against the law?  This

16:42:32  18   Court tells them it is against the law to engage in this

16:42:37  19   conduct.  That's the answer.  They're told that every time

16:42:44  20   they fill out one of these forms.

16:42:46  21             It then directs the buyer:  "See instruction

16:42:51  22   for Question 16."  We've shown you what that instruction

16:42:55  23   says.  It has an even more detailed warning about what it

16:42:59  24   means to engage in the business of dealing in firearms.

16:43:02  25   That's why we're here today.  That's the crime they were

16:43:06   1   charged with.  They are engaging in the business of dealing

16:43:10   2   in firearms without a license.

16:43:13   3           We're here for that exact law -- because they

16:43:17   4   broke the exact law that they were warned about every single

16:43:22   5   time.  You heard evidence defendant Arao signed this form at

16:43:30   6   least 41 times for the 41 guns charged in the indictment.

16:43:36   7           You have other evidence that defendant Arao

16:43:39   8   knew that his conduct was against the law.

16:43:45   9           **MR. ROBINSON:**  Your Honor, I'm going to object to

16:43:48  10   what's on the screen.

16:43:51  11           **THE COURT:**  The objection is overruled.  It's

16:43:53  12   argument of counsel, and argument of counsel is not in

16:43:58  13   evidence.

16:43:59  14           **MR. ROBINSON:**  That's 404(b) notice.  No lack of

16:44:01  15   notice.  I'll submit it.

16:44:02  16           **THE COURT:**  Thank you.

16:44:04  17           **MS. DRAGALIN:**  Ladies and gentlemen, let me make

16:44:06  18   it very clear.  Defendant Arao is charged with the crime of

16:44:10  19   engaging in business of dealing in firearms without a

16:44:13  20   license.  He's also charged with conspiring with defendant

16:44:17  21   Fernandez to commit that same crime.

16:44:19  22           He is not charged with other conduct

16:44:22  23   including committing straw purchases or anything else.

16:44:27  24   However, when you make the decision about whether this

16:44:31  25   defendant, defendant Arao, knew that his conduct was against

16:44:37  1    the law, you can take into consideration that there were

16:44:41  2    other laws that he was warned about, and that his conduct,

16:44:48  3    his conduct that he's charged for in this case violated the

16:44:52  4    law.

16:44:53  5              **MR. ROBINSON:**  Same objection.

16:44:55  6              **THE COURT:**  Let me see counsel at sidebar.

16:45:09  7              (Sidebar conference.)

16:45:09  8              **MR. ROBINSON:**  Okay, Your Honor, there was never

16:45:12  9    any 404(b) notice provided.  We never had the opportunity to

16:45:18  10   litigate.  Your instruction says they cannot consider this

16:45:22  11   evidence for any other purpose.  This evidence being the

16:45:25  12   false statements or the selling to a prohibited person.  But

16:45:30  13   that's exactly what the government is doing.  It's another

16:45:34  14   form of sandbagging.  I'm moving for a mistrial.  It's a

16:45:37  15   constructive amendment of the indictment, in violation of

16:45:40  16   your instruction.

16:45:40  17             **MS. DRAGALIN:**  Your Honor, we have to prove that

16:45:45  18   this defendant knew that he violated the law, and the law is

16:45:47  19   clear that that requirement requires the proof that he knew

16:45:50  20   he violated any law, not just the licensing requirement.

16:45:53  21             The jury has heard the evidence that he's

16:45:56  22   filled out this 4473 Form.  It's inextricably intertwined

16:46:04  23   with a conspiracy in this case.  That is not 404(b) evidence.

16:46:06  24   Even if it were, it's relevance to knowledge of the law,

16:46:10  25   which is what the government has the burden of proving.

16:46:10  1          **MR. ROBINSON:**  Your Honor, there are notice of

16:46:12  2    requirements --

16:46:12  3          **THE COURT:**  The objection is sustained.

16:46:14  4          **MR. ROBINSON:**  Your Honor, I move for a mistrial,

16:46:18  5    please.

16:46:18  6          **THE COURT:**  Denied at this time.  Other than an

16:46:20  7    option to renew.

16:46:20  8          **MR. ROBINSON:**  Instruct the jury to disregard this

16:46:23  9    argument, please.

16:46:34  10          (In open court.)

16:46:37  11          **THE COURT:**  The objection has been sustained.  You

16:46:39  12    may proceed.

16:46:41  13          **MS. DRAGALIN:**  Thank you, Your Honor.

16:46:46  14          Now, you heard comments about why would these

16:46:50  15    defendants create a paper trail if they thought they were

16:46:55  16    breaking the law?

16:46:58  17          Agent Hamilton, the expert in this case,

16:47:01  18    explained to you how a paper trail works for a gun.  Every

16:47:06  19    time there is a sale of a gun, there is a paper trail created

16:47:10  20    through the 4473 Form.  Beginning of the manufacturer who

16:47:15  21    sells it to a distributor, who sells it to an FFL, every time

16:47:20  22    there is a transfer, there is a 4473 and a paper trail.

16:47:24  23          Now, think about the scheme that these two

16:47:27  24    defendants were running together.  They're charged with

16:47:32  25    buying and selling guns over and over without a license.

16:47:38  1          Step one:  You have to buy a gun to be able
16:47:42  2  to complete the scheme.  Every time they buy a gun from a
16:47:47  3  legitimate FFL, from anyone, there is going to be a paper
16:47:50  4  trail showing that the gun was sold to defendant Fernandez or
16:47:56  5  defendant Arao.  There is a record of paper trail.
16:47:58  6          If either of these defendants sold that gun
16:48:02  7  without any paperwork, without completing the 4473, and that
16:48:07  8  gun was later found at the scene of a crime, Special Agent
16:48:13  9  Hamilton told you what would happen.  ATF or agents can run
16:48:18  10  the serial number of that gun through their system.  It will
16:48:22  11  tell them who was the last registered owner of that gun.
16:48:28  12          If they did that, without a paper trail, that
16:48:32  13  gun would lead agents straight to the door of defendant
16:48:37  14  Fernandez and straight to the door of defendant Arao.  So, of
16:48:42  15  course they had to create a paper trail.  Of course they had
16:48:47  16  to fill out the 4473 Form.
16:48:50  17          They are not charged in this case for failing
16:48:52  18  to fill out those forms.  That's not the crime.  For their
16:48:56  19  scheme to work, they had to make sure to paper it
16:49:00  20  appropriately.
16:49:02  21          They knew that dealing without a license was
16:49:07  22  unlawful because they filled out the 4473 Form every time,
16:49:12  23  because that form warned them every time.
16:49:20  24          The paper trail does not show that they
16:49:23  25  thought that what they were doing was legal.  It shows that

16:49:27  1    they were making sure they were covering their tracks in case

16:49:32  2    these guns ever got recovered in the hands of someone who

16:49:35  3    shouldn't have it.

16:49:43  4              Now, these two defendants you heard over and

16:49:46  5    over are police officers.  One issue I'd like to point out is

16:49:52  6    that the law applies to everyone equally.  It applies to

16:49:58  7    regular citizens in the exact same way that it does to police

16:50:04  8    officers.  In that regard the law applies to everyone

16:50:09  9    equally.  We are all equal under the law.

16:50:13  10             In this case, the fact that these two police

16:50:17  11   officers had a job as police officers is relevant to the

16:50:22  12   decisions you have to make, the decision about whether they

16:50:26  13   knew that their conduct was unlawful.

16:50:31  14             Now, the judicial notice 1, which is Exhibit

16:50:36  15   203, you'll have that with you, sets forth three simple

16:50:41  16   principles under California law.

16:50:47  17             Item 2 makes clear there is an exemption for

16:50:52  18   off-roster firearms for police officers for use in the

16:50:57  19   discharge of their official duties.  The exemption does not

16:51:04  20   say:  Law enforcement officers can buy off-roster firearms to

16:51:10  21   sell them to make a lot of money for use in the discharge of

16:51:16  22   their official duties.

16:51:22  23             How did these officers think that they were

16:51:25  24   following the law when they bought guns then resold them

16:51:33  25   sometimes the same day, sometimes the next day.

16:51:41   1          I also want to address the undercover
16:51:44   2   purchase that was mentioned in defendant Arao's closing.  The
16:51:50   3   defendants mentioned Exhibit 205.  You'll have a copy of the
16:51:52   4   full exhibit, and I encourage you to read it.  It's eight
16:51:55   5   pages from beginning to end.  I'll highlight just a few.
16:51:59   6          You heard testimony from Agent Hart that
16:52:01   7   these are direct messages between the undercover agent and
16:52:05   8   defendant Fernandez.  Read those messages from beginning to
16:52:09   9   end.  You'll see comments like:  6,000 for the Bryan Powley:
16:52:18  10   *These belong to a friend of mine.  He's about to set his*
16:52:21  11   *prices.*
16:52:22  12          July 17:  *My buddy said he will take 5500.*
16:52:28  13          I suggest to you $5500.
16:52:30  14          Further down:  *My partner, let me know when*
16:52:35  15   *so I can work out something with him.*
16:52:37  16          And then, if you have any doubt who he means
16:52:39  17   when he says "my partner," he says:  *Okay, my partner Eddie*
16:52:43  18   *is at the place.*
16:52:51  19          You heard Agent Hart tell you that exhibit
16:52:54  20   206 is a screen shot of the gun that Special Agent Duncan in
16:52:58  21   his undercover capacity was trying to buy on July 24, 2017.
16:53:03  22          You have this exhibit with you.  You can read
16:53:05  23   the serial number, 153LTD.  You also have in Exhibit 38 a
16:53:13  24   receipt for the purchase of that gun, 153LTD, sent to
16:53:23  25   eddiarao@hotmail.com on July 10, 2017 for $1955.  July 10,

16:53:34  1   2017, $1955.

16:53:37  2               July 24th, the text messages show the prices

16:53:41  3   they were quoting were $5500, two weeks later for this gun.

16:53:47  4   That's over $3500 markup for one gun.  The defendants are

16:53:54  5   charged for selling together in Count One 86 guns in the

16:54:03  6   course of two years.

16:54:04  7               I want to leave you an analogy on this point

16:54:07  8   about their knowledge of the law.  Now, imagine, you are a

16:54:11  9   citizen walking up to a liquor store about to buy a bottle of

16:54:15  10  liquor.  The liquor store needs a licensed to sell you the

16:54:20  11  bottled liquor.  Now, say there is a teenager waiting outside

16:54:24  12  who's 15 years old and cannot buy alcohol.  The teenager asks

16:54:28  13  you to walk into the store and buy a liquor bottle for them.

16:54:34  14  You walk into the store, you buy the liquor bottle for $10,

16:54:39  15  walk out, you give it to the teenager for $20, and you walk

16:54:44  16  away.

16:54:47  17              How could anyone think that that type of

16:54:50  18  conduct is lawful?

16:54:53  19        MR. ROBINSON:  Objection.  I'm going to object for

16:54:55  20  the same reasons that I objected previously that you

16:54:58  21  sustained.  This analogy is towards uncharged conduct.

16:55:04  22        MR. RODRIGUEZ:  Join.

16:55:05  23        THE COURT:  The objection is sustained.  Let's

16:55:07  24  move on and close.

16:55:09  25        MS. DRAGALIN:  Yes, Your Honor.

16:55:12   1               The defendants are charged with dealing

16:55:14   2     without a license.  The point is, they didn't have a license

16:55:19   3     to engage in the conduct that they were engaging in.

16:55:23   4               And lastly, I won't belabor these points, but

16:55:26   5     I do want to talk about whether these defendants were

16:55:31   6     operating out in the open, as you heard from both defendants.

16:55:36   7               I submit to you that the evidence that you

16:55:38   8     saw shows that there were certain things that were public on

16:55:42   9     Instagram, there were other things that were not public,

16:55:45   10    like, text messages, direct messages.  You heard that it

16:55:48   11    takes a search warrant to be able to get these private types

16:55:52   12    of conversation.

16:55:53   13              I encourage you to look at the records that

16:55:55   14    you have with you, look at the public posts and what they're

16:55:59   15    saying in the public posts, and compare that to what

16:56:03   16    defendant Fernandez is saying behind the scenes in private

16:56:09   17    messages with other individuals, what he is saying to people

16:56:12   18    in text messages and WhatsApp messages.

16:56:18   19              That shows the consciousness of guilt.  He

16:56:20   20    knows that he cannot say the most incriminating things in the

16:56:23   21    public posts.  That's saved for the private messages.

16:56:28   22              And the last point about putting the pieces

16:56:32   23    of the puzzle together.  Counsel for defendant Fernandez is

16:56:38   24    right, this case took a lot of work to put all the pieces of

16:56:43   25    the puzzle together.  It is not just obvious and out in the

UNITED STATES DISTRICT COURT

16:56:47  1    open.

16:56:47  2              The agents had to piece together all of the

16:56:51  3    firearm records, they had to talk to witnesses, they had to

16:56:53  4    get search warrants for houses, for phones, for e-mails, for

16:56:57  5    Instagram records.  It took a lot of work to put all of these

16:57:01  6    puzzle pieces together.  It was not obvious and in the open.

16:57:06  7    That shows a consciousness of guilt.

16:57:08  8              Defendant Fernandez was trying to hide what

16:57:12  9    he was actually doing in his private communications.  That is

16:57:15  10   the best indicator of what he was doing and what he knew.

16:57:19  11             Ladies and gentlemen, you've heard evidence

16:57:23  12   over the past two weeks because the government has the burden

16:57:26  13   to prove to you beyond a reasonable doubt that these

16:57:29  14   defendants committed these crimes.  And there have been

16:57:33  15   witnesses, there have been all these records that you have to

16:57:37  16   consider, because you have to find that there is evidence of

16:57:41  17   these crimes.

16:57:42  18             And you do have to find that they are guilty

16:57:45  19   beyond a reasonable doubt.  That it is a very high standard

16:57:48  20   as it should be.  That is the same standard that every jury

16:57:52  21   has applied in a criminal case.  Every defendant who has been

16:57:57  22   convicted and found guilty in a criminal case has been found

16:58:01  23   guilty in this country under the standard beyond a reasonable

16:58:05  24   doubt.

16:58:06  25             The evidence in this case has proven that

16:58:10    1    these defendants are guilty beyond a reasonable doubt of each

16:58:15    2    of the counts they are charged with, and the government asks

16:58:17    3    you to return the only verdict consistent with the evidence,

16:58:23    4    guilty on all counts.

16:58:24    5              THE COURT:  Thank you, Ms. Dragalin.

16:58:26    6              That concludes the argument of counsel.  It's

16:58:28    7    5:00 o'clock.  We can have the jury stay longer if everybody

16:58:32    8    agrees.  Otherwise, the jury would be excused.

16:58:37    9              Okay, I understand that somebody needs to be

16:58:39   10    excused.  So, the jury is going to be excused.  Please return

16:58:42   11    tomorrow, and we'll start again tomorrow at 8:30.

16:58:45   12              During your absence, do not discuss this case

16:58:50   13    amongst yourselves or with any other person, please.

16:58:50   14              I'm informed by Mr. Cruz that it may rain

16:58:53   15    tomorrow.  So, make sure to you give yourself additional time

16:58:57   16    to get to the Court.

16:58:59   17              (Following proceedings held outside the presence

16:59:36   18    of the jury.)

16:59:36   19              THE COURT:  Before we start with other matters, I

16:59:38   20    want to cover jury instructions again.

16:59:40   21              We have the Instruction No. 19 that was read

16:59:46   22    after the Court read all of the instructions to the jury, and

16:59:54   23    again when we -- when we discussed instructions in the

16:59:57   24    morning and then in the afternoon today, the Court went

17:00:02   25    through each of the instructions in order advising all

17:00:06  1  parties of the instructions that the Court would be giving,

17:00:11  2  and then what apparently was not included was this

17:00:15  3  instruction that has -- has been identified as Instruction

17:00:18  4  19, which should have been given, I agree.  And the question

17:00:22  5  is where in the order of instructions do you want this

17:00:25  6  placed?

17:00:26  7          MS. RYKKEN:  Your Honor, in the list that the

17:00:28  8  government has sent to Mr. Cruz, it's listed as No. 19.  And

17:00:33  9  I noted that when you were reading them, you had said 19

17:00:37 10  twice or 20 twice.  So I think there just must have been some

17:00:41 11  confusion.  So that would be No. 19, and then conspiracy

17:00:46 12  elements for Count Four would be 20 --

17:00:48 13          THE COURT:  So, you've sent a new set to Mr. Cruz.

17:00:52 14          MS. RYKKEN:  I did earlier, yes.

17:00:53 15          THE COURT:  Let me have the lawyers look at that

17:00:55 16  new set to make sure that all the instructions are included.

17:01:00 17  Agreed?

17:01:00 18          MR. ROBINSON:  Yes, Your Honor.

17:01:01 19          MR. RODRIGUEZ:  Your Honor, what time would you

17:01:03 20  like counsel back tomorrow, 8:30?

17:01:06 21          THE COURT:  Yes, we're going to need you here at

17:01:10 22  8:30.  Yes.

17:01:12 23          MR. ROBINSON:  Should I just address the Court

17:01:13 24  now, Your Honor?

17:01:14 25          THE COURT:  It's up to you.

17:01:15  1        **MR. ROBINSON:**  Yes.  If I may, Your Honor, I've

17:01:44  2  never seen anything like this.  We have briefed constructive

17:01:49  3  amendment, we've briefed severance, we dealt with Bruton

17:01:53  4  issues, we agreed to bifurcate the case for presentation.  We

17:02:01  5  agreed on a limiting instruction that you gave repeatedly

17:02:06  6  that indicates -- that states, not indicates -- in this

17:02:14  7  Court's Instruction No. 9:  To the extent you have any

17:02:15  8  evidence regarding defendant Arao during these witnesses'

17:02:18  9  testimony that -- with respect to Fernandez, you are only to

17:02:21  10  consider it for the limited purpose of the two crimes charged

17:02:25  11  and not for any other purpose.

17:02:28  12        We have identified repeatedly the fact that

17:02:31  13  because Officer Arao is not charged with the false statements

17:02:37  14  and not charged with the sales to prohibited persons, that

17:02:41  15  the evidence against him is limited.

17:02:44  16        The government knows, Your Honor, that under

17:02:47  17  Federal Rule of Evidence 404(b) they must give us notice so

17:02:51  18  that we can litigate the relevance.  It's absurd that in the

17:02:56  19  rebuttal argument the government would argue the way that

17:02:59  20  they did in violation of your instruction, in an effort to

17:03:04  21  persuade this jury to consider uncharged conduct that has

17:03:08  22  never been litigated with this court as it has to be under

17:03:12  23  Rule 404(b), and you sustained my objection.

17:03:17  24        Undeterred, undeterred, Your Honor, they did

17:03:21  25  it again.  And it's just like the situation with the witness

17:03:26  1    yesterday when they asked the witness to give a lay opinion

17:03:30  2    that amounted to what I characterized as a Bruton statement,

17:03:33  3    but is a statement that we have agreed and you have agreed

17:03:37  4    and the jury has been told cannot be used against Officer

17:03:42  5    Arao, and they did it anyway, and you sustained that

17:03:46  6    objection.

17:03:49  7                The cumulative nature of the misconduct here,

17:03:52  8    Your Honor, has made it so that Officer Arao cannot receive a

17:03:56  9    fair trial.  This jury has been deliberately, in the face of

17:04:00  10   your instruction and despite your sustaining objections, has

17:04:05  11   continued to present theories that are inadmissible and

17:04:12  12   unreliable and in contravention of your orders.

17:04:17  13               I don't know what's happening here, but I do

17:04:20  14   know that the cumulative effect and a complete disregard for

17:04:21  15   your orders has created a situation where Mr. Arao cannot

17:04:25  16   receive a fair trial, and no instruction by you to this jury

17:04:29  17   is going to cure the problem that's been created.  And it's a

17:04:34  18   repetitive, ongoing, blatant problem.

17:04:37  19               And for that reason, Your Honor, I would ask

17:04:39  20   the Court to grant a mistrial as to Officer Arao.  Thank you.

17:04:44  21        **THE COURT:**  Thank you.  And just for -- to be

17:04:46  22   clear, the Court has provided the -- read the instruction

17:04:50  23   regarding the limited use of evidence on several occasions.

17:04:53  24               The Court sustained the objection of

17:04:56  25   Mr. Robinson, I think, joined in on the second round by

17:04:59  1    Mr. Rodriguez.  And the Court has instructed the jury in the

17:05:06  2    set of instructions that the defendants are charged only with

17:05:09  3    the charges in the indictment and not for any other conduct.

17:05:12  4              So, let me hear from counsel for the

17:05:14  5    government.

17:05:15  6         MS. DRAGALIN:  Yes, Your Honor.

17:05:20  7              Count One of the indictment charges a

17:05:22  8    conspiracy to deal in the business of firearms without a

17:05:26  9    license.  Object --

17:05:28  10             One of the objects of the conspiracy is

17:05:30  11   listed.  Defendant Arao would transfer off-roster firearms

17:05:36  12   from Ronin Tactical Group to himself.  That is one of the

17:05:40  13   means by which this object was committed.  It is conduct that

17:05:45  14   is essential to the conspiracy charge, and the government's

17:05:49  15   theory of the case as charged in the indictment as repeatedly

17:05:55  16   explained in the government's motions and opposition in

17:05:59  17   pretrial litigation.  That has been the government's theory

17:06:04  18   from the start.  It has not changed in any way.  It is

17:06:08  19   inextricably intertwined with the conspiracy evidence.  It is

17:06:14  20   not other acts.  It is not 404(b) evidence of other acts.

17:06:19  21        THE COURT:  Ms. Robinson, please.  One moment.

17:06:23  22   Let counsel finish.

17:06:25  23        MS. DRAGALIN:  For that reason, Your Honor,

17:06:27  24   because the government has the burden of proof to prove that

17:06:31  25   the defendant acted willfully, in other words, that he knew

17:06:34  1    he was violating the law.

17:06:36  2                    And in the Ninth Circuit, it's clear that

17:06:39  3    that instruction means he was violating any law, not just the

17:06:44  4    licensing law.  And so it is relevant and actually essential

17:06:47  5    to the government's case to be able to prove that he was

17:06:50  6    violating and knew he was violating other laws.

17:06:55  7                    The jury has been repeatedly instructed and

17:06:57  8    warned, he is not charged with that separate crime.  However,

17:07:02  9    it is relevant to his knowledge of the law that he was warned

17:07:06  10   on these forms every time about a straw purchase.

17:07:09  11                   And when one of the means of the conspiracy

17:07:13  12   is this exact conduct, it is not an inappropriate to ask the

17:07:19  13   jury to consider that for the purpose of deciding whether he

17:07:22  14   acted willfully.

17:07:26  15             **THE COURT:**  One final rebuttal.

17:07:27  16             **MR. ROBINSON:**  Yes.  The means of the conspiracy,

17:07:30  17   it's almost unimaginable in your rebuttal argument --

17:07:36  18             **THE COURT:**  Mr. Robinson, please direct yourself

17:07:38  19   to the Court.

17:07:39  20             **MR. ROBINSON:**  In the rebuttal argument for the

17:07:42  21   government to argue after we have constructed this case in a

17:07:46  22   manner to -- to cure the possible constructive amendment, to

17:07:52  23   protect Mr. Arao from an argument that he was being convicted

17:07:58  24   for uncharged conduct, to not give notice of 404(b) like they

17:08:04  25   know they're supposed to so that we can limit it, and so that

17:08:08  1    this jury could have been instructed on the limited use of

17:08:11  2    that information which says under the model instruction, it

17:08:16  3    cannot be used to convict.

17:08:18  4                    This is classic sandbagging, and they know

17:08:21  5    it.  And you sustained these objections.  And this is

17:08:24  6    cumulative misconduct.  Your Honor, this is an unfair

17:08:29  7    situation to Officer Arao, and it is gamesmanship by the

17:08:33  8    prosecutor in violation of your orders, and I ask you to

17:08:37  9    declare a mistrial.

17:08:38  10         THE COURT:  The request for a motion for a

17:08:42  11   mistrial will be denied.

17:08:43  12                   That being said, there has been aggressive

17:08:47  13   prosecution on the part of the government here during the

17:08:50  14   course of this trial, which I'm concerned about.

17:08:54  15                   We are adjourned.

17:08:58  16                   (Proceedings concluded.)

17:09:04  17        THE COURT:  Oh, we have verdict forms to look at.

17:09:11  18   We're back in session.

17:09:16  19                   Mr. Robinson, we're back in session.  We have

17:09:20  20   verdict forms.

17:09:42  21                   Please have a seat.

17:09:44  22                   We have the verdict form to cover.

17:09:55  23                   So, the government provided a proposed

17:09:58  24   verdict form which includes verdicts as to both defendants in

17:10:12  25   and what Mr. Cruz has done, is to separate the --

17:10:19  1            To have two different verdict forms, one for

17:10:22  2   defendant Arao and one for defendant Fernandez.  So, let me

17:10:24  3   have counsel review the verdict forms, and I think either

17:10:28  4   format is probably acceptable, but it's really up to the

17:10:32  5   parties.

17:10:33  6            **MR. ROBINSON:**  For the record, we've reviewed

17:10:35  7   them, Your Honor, and we would accept the one that Mr. Cruz

17:10:38  8   provided, where we have separate verdict forms for both

17:10:41  9   defendants.

17:10:42  10           **THE COURT:**  Let me hear from the government.

17:10:44  11           **MS. RYKKEN:**  Just one moment.

17:10:45  12           **MR. RODRIGUEZ:**  Your Honor, on behalf of

17:10:47  13   Mr. Fernandez, I reviewed them as well.  They're fine.

17:10:51  14           **THE COURT:**  Separate verdict forms.

17:10:52  15           **MR. RODRIGUEZ:**  Yes, Your Honor.

17:10:54  16           **THE COURT:**  Okay.

17:10:54  17           **MR. RODRIGUEZ:**  Thank you.

17:11:01  18           **THE COURT:**  Ms. Rykken?  Are they agreeable?

17:11:01  19           **MS. RYKKEN:**  Yes, Your Honor.

17:11:02  20           **THE COURT:**  Okay, we have agreed upon verdict

17:11:02  21   forms.

17:11:04  22            Anything further before we adjourn?

17:11:07  23           **MS. RYKKEN:**  No, Your Honor.

17:11:08  24           **MS. Dragalin:**  No, Your Honor.

17:11:10  25           **THE COURT:**  Thank you.  8:30.

UNITED STATES DISTRICT COURT

17:11:13  1                COURT CLERK:  This Court is in recess.

17:11:19  2                     (Court adjourned.)

3

4                              ~ ~ ~

5

6                    C E R T I F I C A T E

7    I hereby certify that the foregoing is a true and correct

8    transcript of the stenographically recorded proceedings in

9    the above matter.

10   Fees charged for this transcript, less any circuit fee

11   reduction and/or deposit, are in conformance with the

12   regulations of the judicial conference of the united states.

13

14

15   /S/Anne Kielwasser
     _____          _11/30/2019__
16   Anne Kielwasser, CSR, RPR         Date
     Official Court Reporter
17

18

19

20

21

22

23

24

25